UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Perion Network Ltd. Securities Litigation | Case No.  1:24-cv-02860<br><br>AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    JURISDICTION AND VENUE .................................................................... 8

III.   PARTIES ...................................................................................................... 8

IV.    SUBSTANTIVE ALLEGATIONS ............................................................. 11

       A.    PERION'S BUSINESS ....................................................................... 11

       B.    PERION'S SEARCH BUSINESS ........................................................ 13

       C.    PERION'S CONTRACT WITH MICROSOFT BING .............................. 16

             1.    Microsoft's Search Advertising Business ................................ 19

             2.    Perion's Reliance on Its Business With Microsoft .................. 20

       D.    PERION DEPENDS ON LOW-QUALITY PUBLISHERS ............................... 25

       E.    PERION'S SEARCH BUSINESS WAS BASED ON LOW-QUALITY
             PUBLISHERS ................................................................................... 28

             1.    Microsoft Curtailed Its Relationship With Perion As The Company's
                   Improper Practices Came to Light ............................................ 30

             2.    Confidential Witnesses Corroborate Perion's Low-Quality
                   Publishers ................................................................................. 39

       F.    THE INDIVIDUAL DEFENDANTS PROFITED FROM THEIR FRAUD ....... 53

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
       DURING THE CLASS PERIOD ...................................................................... 58

       A.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
             FROM 2021 ...................................................................................... 59

       B.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
             FROM 2022 ...................................................................................... 71

       C.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
             FROM 2023 ...................................................................................... 81

       D.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
             FROM 2024 ...................................................................................... 91

VI.    THE TRUTH BEGINS TO EMERGE .......................................................... 97

VII.   ADDITIONAL SCIENTER ALLEGATIONS ............................................. 104

VIII.  NO SAFE HARBOR .................................................................................... 107

i

IX.    CLASS ACTION ALLEGATIONS ................................................................. 108

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
        AND *AFFILIATED UTE* PRESUMPTIONS ................................................. 110

COUNT I .................................................................................................................... 111

COUNT II ................................................................................................................... 113

XII.    PRAYER FOR RELIEF ................................................................................. 119

XIII.    DEMAND FOR TRIAL BY JURY ................................................................ 119

Lead Plaintiffs Menora Mivtachim Insurance Ltd. ("Menora Insurance"), Menora Mivtachim Pensions and Gemel Ltd. ("Menora Pensions & Gemel"), Menora Mivtachim Vehistadrut Hamehandesim Nihul Kupot Gemel LTD (collectively, "Menora"), Clal Insurance Company Ltd., Clal Pension and Provident Ltd., and Atudot Pension Fund for Employees & Independent Workers Ltd. (collectively "Clal" and, together with Menora, "Menora and Clal") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' (defined below) public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by Perion Network Ltd. ("Perion" or the "Company"), analysts' reports and advisories about the Company, interviews of confidential witnesses, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I.     <u>INTRODUCTION</u>

1.      Plaintiffs bring this federal securities class action on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Perion stock between February 9, 2021 through June 7, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of securities laws.

2.      Perion is an "ad tech" company that provides online advertising services. This case

---

[1] Emphases herein are added unless noted otherwise below.

arises out of Defendants' misrepresentation of the nature of Perion's clients as high-quality digital publishers when Perion actually derived a substantial portion of its business from low-quality publishers that dealt with junk or worthless online traffic, including fake users, clickbait, and traffic from less desirable geographic regions.

3.      The Company billed itself as providing sophisticated technological solutions across all aspects of the online advertising industry through its "proprietary Intelligent Hub" that purportedly "process[es] billions of signals from across out network and properties" and serves as a "cross-company data layer" that "provides significant value to our publishers, delivering more opportunities to monetize their inventory and generate incremental revenue" through Perion's "unified platform [and] multiple ad products, from different business units." Rather than providing these sophisticated services, however, Perion's business relied on sending low-quality search traffic to Microsoft's Bing search engine.

4.      One of Perion's two business segments was its Search Advertising business. This business unit was highly dependent on a contract that Perion had with Microsoft to distribute Microsoft's Bing search engine to Perion's publisher clients and share in the revenue that was generated from advertisements that were shown in response to searches that internet users conducted while using those publishers' websites or online products. As an investment analyst explained, Perion "makes money in Search" by serving as "a distributor for Bing globally. That is, Microsoft has given PERI the right to put Bing on browsers, devices, and websites globally, for a share of the ad dollars on Bing's results pages."

5.      In November 2020, just before the Class Period, Perion renewed its agreement with Microsoft for an additional four years, through 2024. The Company promoted the renewal as "a major factor in Perion's path to achieve sustainable and highly profitable double-digit annual

revenue growth going forward," and forecast that it would earn $900 million in revenue from 2021 through 2024 from the agreement. Perion was one of the largest distributors of Microsoft's search engine.

6.      Perion disclosed that the "Microsoft Agreement accounted for 37%, 35% and 34% of our revenue, in 2021, 2022 and 2023, respectively." It also accounted for between 74% and 82% of the revenue from Perion's Search Advertising business during that time.

7.      The quality of Perion's search traffic was very important because billions of dollars are wasted each year in the online advertising industry on low-quality users, including fake users (known as click fraud), users obtained through clickbait (who are considered unlikely to have sufficient commercial interest in the content they are engaging with), and users from less valuable geographic regions. Microsoft thus promoted its search advertising as excluding fraudulent or low-quality searches and made a condition of its agreement with Perion that the Company's publishers exclude such traffic.

8.      Defendants represented the searches that Perion sent to Microsoft through the Company's online publishers as high-quality online traffic from internet users that were likely to be interested in making purchases based on the resulting advertisements. For example, Defendant Gerstel told investors on Perion's earnings call for the fourth quarter of 2022 that Microsoft expects Perion to "screen all searches and we will deliver only quality searches because quality means searches with high intent." He further explained that a "quality searcher is the one that clicks and actually has true intent to buy or true intent to visit this website. What is [] non-quality is bots and everything [that] is not having an intent" to purchase. Gerstel then told investors, in May 2023, about Perion's "very rigid quality" process that it employs to meet Microsoft's standards.

9.      Similarly, after Perion won Microsoft's Advertising's Supply Partner of the Year

Award in February 2022, because Microsoft was not yet fully aware of the true nature of Perion's search traffic, Defendant Jacobson attributed the award to Perion's purported "relentless focus on quality" in its search business. During the Class Period, Defendants repeatedly promoted the quality of Perion's publishers as supporting its Search business and relationship with Microsoft. These statements to investors misrepresented the nature of the Company's Search business and the risk that Microsoft would curtail its relationship with Perion because of the low quality of Perion's publishers.

10.    Analysts credited Perion's representations regarding high-quality search traffic sent to Microsoft. For example, Lake Street wrote in an August 2, 2023 report, in which it raised its 2023 guidance for the Company, that Perion "delivers quality traffic to its search monetization partners, such as Microsoft Bing."

11.    Perion, however, relied heavily on low-quality search traffic. Contrary to how Perion represented its business to investors, it did not possess sophisticated technological capabilities that differentiated it from its competitors. The Company was therefore heavily reliant on its role as a primary distributor of Microsoft's search engine. It inflated that business by relying on undesirable search traffic.

12.    A confidential witness that worked in the Sales department of CodeFuel (the division that ran Perion's Search business) during the Class Period explained the true nature of Perion's Search business. CW 1 described how Perion's relationship with Microsoft was based on junk traffic involving fake users, searches from non-monetizable geographic regions, and clickbait.

13.    CW 1 explained that when one of Perion's publishers got flagged as low-quality, the common practice among the Company's salesforce was to reincorporate the publisher under a different name and then continue to work with it under the Microsoft agreement. The witness also

explained how the CodeFuel salesforce would work with publishers to manage their level of junk traffic in order to prevent them from being flagged based on sudden spikes in traffic levels. CW 1 explained specifically that these publishers would get approved by Microsoft based on a small number of legitimate users that the publisher used to launder the junk traffic that it would mix in after it was approved. These publishers that CodeFuel's employees surreptitiously reincorporated accounted for at least 30% to 40% of the traffic that Perion sent to Microsoft.

14.    Moreover, CW 1 described several ***additional*** tactics that CodeFuel used to generate low-quality traffic. Perion's publishers included clickbait websites and CodeFuel hid from Microsoft that it secretly turned on a VPN (virtual private network) that masked the true identity of their users even though Microsoft prohibited that practice. CW 1 also explained the common understanding among CodeFuel employees that even its legitimate publishers sent a large amount of junk traffic to Microsoft. This witness and CW 2 both independently explained that the purpose of Microsoft's relationship with Perion was for Perion to serve as a buffer between such low-quality traffic and Microsoft.

15.    In addition, CW 1 explained that these schemes were known by everyone at CodeFuel, including its management. CW 1 discussed these practices directly with their immediate supervisor, who reported to Defendant Jacobson (the head of CodeFuel before he was appointed Perion's CEO during the Class Period). This witness described that their supervisor not only knew about these practices, he "invented the games" and he "taught the games".

16.    Perion's reliance on low-quality publishers was also revealed through a series of articles in the spring of 2024. Websites that seek to attract users through attention-grabbing ads and then make money from the ads that they overload on their own sites alongside generic or difficult-to-read content are known as "made for advertising" sites, or clickbait. On April 4, 2024,

5

the *Wall Street Journal* reported that *Forbes* ran one of these websites on which advertisers were being tricked into overpaying for ads. A further investigation by publications involved in the ad tech industry then revealed that Perion's Content IQ division was one of the main purveyors of clickbait sites across the internet both for third parties—such as *Newsweek*—and Perion's "owned and operated" websites containing names such as Boredom Therapy and Pets Fanatic. These revelations created bad press for Perion and it quickly proceeded to shut down Content IQ.

17.    Several confidential witnesses discussed below corroborate that Content IQ focused on made-for-advertising websites. For example, CW 4, who worked at Content IQ during the Class Period, described its websites as "clickbait" containing "low-brow ads," which obtained all of their visitors from paid traffic.

18.    Other witnesses corroborate the fact that Perion did not actually offer advertisers sophisticated technological services. For instance, CW 3 explained that Perion's Undertone division did not actually target ads as it promised its customers it did. Instead, it was "just running the impressions on whatever sites were available," including on many sites that "weren't actual respected websites."

19.    All of these improper practices are related because Perion integrated its different services together through its iHub and distributed its search services to publishers in other parts of its business. The Company stated that it was "constantly looking for more ways to distribute our search offering through various channels, including through independent distribution efforts of our owned and operated products and services." Perion also described its "'capture and convince' solutions suite" for its advertising customers as "complemented by our search offering that provides monetization solutions and capabilities to publishers' own products and services."

20.    Perion faced the consequences of its improper practices after these types of tactics

garnered substantial attention following the *Wall Street Journal*'s revelation on April 4, 2024 of Forbes's clickbait site and the ensuing investigation into Content IQ. Microsoft thus became forced to pay more attention to the true nature of Perion's business. On April 8, 2024, Perion issued a press release announcing preliminary financial results for 2024, revealing that "[i]n the first quarter of 2024, Perion experienced a decline in search advertising activity, attributable to changes in advertising pricing and mechanisms implemented by Microsoft Bing in its Search Distribution marketplace." Perion substantially lowered its expected revenue for 2024 from its prior guidance range that had a midpoint of $870 million to a new range with a midpoint of just $600 million. On this news, Perion's stock price declined by over 40%.

21.     Defendants, however, did not reveal the full extent of the negative impact that the Company's practices had on its relationship with Microsoft because they represented that Perion's "relationship with Microsoft remains strong" and continued to misrepresent the nature of Perion's Search business. Then, on June 10, 2024, Perion lowered its financial guidance even further because "[i]n recent days, Perion was notified by Microsoft Bing of its decision to exclude a number of publishers from its search distribution marketplace." These changes were expected to bring "search revenue from our agreement with Microsoft Bing" down to "less than 5% of Perion's revenue in the second half of 2024" and made Perion's agreement with Microsoft Bing "no longer material to Perion." Defendant Jacobson admitted that "[t]he recent changes Microsoft Bing implemented to its Search distribution marketplace are unfortunate and significantly impacted our Search Advertising business." On this news, the price of Perion stock declined another 30%.

22.     Microsoft's elimination of most of its business with Perion resulted from the poor quality of the search traffic that Perion sent to Microsoft. As Needham explained in a report that it published on June 10, 2024, "[w]e assume MSFT believes that these publishers it listed are low

quality websites." These changes caused Perion's stock price to drop from $21.11 per share before Perion's initial announcement of these changes on April 8, 2024, to just $8.61 per share following Perion's announcement on June 10, 2024 of Microsoft's exclusion of Perion's publishers, resulting in at least hundreds of millions of dollars in losses to Perion's shareholders.

## II.    JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act," 15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24.     This Court has jurisdiction over the subject matter of Counts I-II pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. This Court has supplemental jurisdiction over Count III pursuant to 28 U.S.C. § 1367(a).

25.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Perion is incorporated in Israel and has offices located in this Judicial District, Defendants conduct substantial business in this Judicial District, and a significant portion of Defendants' activities alleged herein took place within this Judicial District. Perion designates its Intercept Interactive Inc. business (doing business as Undertone), which is located in this Judicial District (at One World Trade Center, 71st Floor, Suite J, New York, NY 10007), as the Company's agent for service of process.

26.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

27.     Lead Plaintiffs are Menora Mivtachim Insurance Ltd. ("Menora Insurance"),

Menora Mivtachim Pensions and Gemel Ltd. ("Menora Pensions & Gemel"), Menora Mivtachim Vehistadrut Hamehandesim Nihul Kupot Gemel LTD (collectively, "Menora"), Clal Insurance Company Ltd., Clal Pension and Provident Ltd., and Atudot Pension Fund for Employees & Independent Workers Ltd. (collectively, "Clal").

28.     Menora is an affiliate of Menora Mivtachim Holdings Ltd., a holding company based in Ramat Gan, Israel, which is among Israel's largest insurance and finance groups, with more than $70 billion in assets under management. Menora acquired Perion's securities at artificially inflated prices during the Class Period, as set forth in the Certification included in their motion to be appointed lead plaintiff (ECF No. 38-3), and was damaged upon the revelation of the alleged corrective disclosures. Moreover, Menora purchased Perion securities on the Tel Aviv Stock Exchange at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

29.     Clal is affiliated with Clal Insurance, one of the oldest insurance companies and largest institutional investors in Israel. Clal is responsible for managing assets totaling approximately $90 billion, including Clal Insurance policy holders and pension and provident funds. Clal acquired Perion's securities at artificially inflated prices during the Class Period, as set forth in the Certification included in their motion to be appointed lead plaintiff (ECF No. 38-3), and was damaged upon the revelation of the alleged corrective disclosures. Moreover, Clal purchased Perion securities on the Tel Aviv Stock Exchange at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

30.     Defendant Perion is a global technology company that provides digital advertising products and services. It is headquartered in Holon, Israel and maintains offices in the United States, including in New York. The Company's stock trades on the NASDAQ under the ticker

symbol "PERI." Perion was founded in 1999 and completed its initial public offering of its ordinary shares on the NASDAQ in the United States on February 3, 2006.[2] Since November 20, 2007, its ordinary shares have also been traded on the Tel Aviv Stock Exchange ("TASE") under the ticker symbol "PERI IT". Both the NASDAQ and the TASE are highly efficient markets. As of December 31, 2023, Perion had approximately 47 million shares outstanding.

31.    Defendant Doron Gerstel ("Gerstel") served as Chief Executive Officer ("CEO") and Director of Perion from April 2017 to August 2023. Gerstel served on Perion's Board of Directors from May 2018 to November 2023.

32.    Defendant Tal Jacobson ("Jacobson") has served as CEO and Director of Perion from August 2023 to the present. Prior to his appointment as CEO, Jacobson served as General Manager of CodeFuel, the Company's division that runs its Search Advertising business, from 2018 until he was appointed CEO. Perion states that during his tenure as CodeFuel's General Manager, Jacobson "turned CodeFuel into a significant driver of Perion's market share and valuation. He also cemented a strategic relationship with Microsoft." In November 2023, Jacobson replaced Gerstel as a member of the Company's Board of Directors.

33.    Defendant Maoz Sigron ("Sigron") served as the Chief Financial Officer ("CFO") of Perion from February 2018 through July 2024. Prior to that, from September 2017 until February 2018, Sigron served as Perion's VP of Finance. Since August 1, 2024, Sigron has served as the Chief Operating Officer ("COO") of Perion.

34.    Defendant Asaf Katzir ("Katzir") co-founded Content IQ in 2014. After Perion acquired Content IQ in January 2020, Katzir served as its Co-CEO through at least March 2021.

35.    Defendants Gerstel, Jacobson, Sigron, and Katzir are referred to collectively as the

---

[2] At the time of its IPO, Perion was called IncrediMail Ltd. It changed its name to Perion in 2011.

"Individual Defendants."

36.    Perion and the Individual Defendants are referred to collectively as "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Perion's Business

37.    Perion offers online digital advertising services. It describes itself as "providing brands, agencies and publishers with the holistic ability to identify and measurably reach their most valuable customers – across all numerous digital channels, including retail media."

38.    The Company stated in its 2020 Annual Report (its first Annual Report filed during the Class Period, on March 25, 2021) that it "operates across the three main pillars of digital advertising – ad search, social media, and display/video/CTV, representing a potential market of more than $340B in 2020 that is expected to grow to $542B in 2024, according to eMarketer." In its 2022 Annual Report, Perion stated that this addressable market increased to "$567 billion in 2022, with an expected growth of $836 billion by 2026."

39.    Perion states that its presence across these "three pillars provides diversification of our revenue streams," which "allows the Company to rapidly capitalize on shifts in spending and budget allocation in a timely and efficient manner. The three pillars are represented by our search ad monetization, which is a direct-response platform that works with a range of different publishers; cross-channel high impact advertising through the open web, including video and CTV; social advertising through our actionable performance monitoring platform; and our content monetization system."

40.    The Company serves as an intermediary between the demand side and the supply side of online advertising. The demand side encompasses those seeking to place ads, including brands, advertising agencies that represent them, and publishers. The supply side includes those that own the advertising space on which ads are placed, such as website owners (also including

publishers), social networks, and other online venues where ads may be placed. Perion also serves as an intermediary between other companies that specialize in online advertisements for the demand side (demand side platforms or "DSPs") and those that work on the supply side (supply side platforms or "SSPs"). The Company thus promotes its "ability to generate revenue from both" the demand and supply side of the business.

41.    Similarly, Perion promotes its "proprietary Intelligent Hub," or "iHUB," as a "centralized and intelligent hub [that] connects the supply side and demand side assets of Perion, processing billions of signals from across our network and properties. This provides five levels of value: operational savings in the form of – shared resources; reduced traffic acquisition costs and media buying optimization; increased customer value; market agility and creative firepower."[3]

42.    The Company depicts its iHub as follows (in its Q4 2021 Investor Presentation):



43.    The Company also promotes its advanced technology as distinguishing its business

---

[3] 2022 20-F, filed on March 15, 2023.

in the online advertising industry by stating (in its 2020 Annual Report) that "Perion further strengthens its technology moat by evolving an integrated offering, branded as 'Capture and Convince,' which represents a significant industry advance in the user funnel."

44.     Similarly, Perion promotes its purported use of AI, stating that "[t]his new user loop, using Artificial Intelligence, or AI, and machine learning to deliver optimized advertising and content to brand-safe sites, has been shown to engage new users for an average of six minutes, generating significant revenue-per-session by uniquely satisfying their interests and affinities."

45.     Perion claims that its "complete technological moat delivers robustly optimized campaigns that combine creativity, reach, and our proprietary targeting capabilities," providing "comprehensive, full-funnel solutions to all brands and agencies."

**B.    Perion's Search Business**

46.     Perion divides its revenue into two categories: Search Advertising and Display Advertising. The Company describes these categories as follows (in its 2023 Annual Report):

- **Search Advertising** - we generate Search Advertising revenue from service agreements with our search partners. Search Advertising revenue is generated primarily from monthly transaction volume-based fees earned by us for making our applications available to online publishers and app developers on a revenue share basis relative to the revenue generated by such search partners.

- **Display Advertising** - we generate revenue from Display Advertising by delivering high-impact ad formats across different channels including display, social, CTV, digital audio, DOOH and Web Publisher Solutions. Our diverse, technology-focused multi-channel set of solutions is designed to drive consumer engagement and high ROI for advertisers through high-impact ad formats. Our solutions also include a content monetization platform that provides publishers with monetization tools across different channels, and a social platform that supports campaign management and media buying capabilities across all major social channels.

47.     Whereas the Display business focuses on targeting ads for Perion's advertising customers across different online formats, the Search business constitutes Perion serving as a distributor of other companies' (largely Microsoft's) search engines. In the Search business, Perion

13

shares search-advertising revenue with those search engines in exchange for Perion placing their search tools with Perion's customers (known as online "publishers").[4]

48.    These business lines, which provide different services, are connected because Perion distributes its Search services to the same publishers that serve as the Company's Display customers. As the Company explains, "Perion's 'capture and convince' solutions suite gives advertisers and publishers the ability to acquire customers — efficiently and at massive scale, and moves them into a branded space created by Perion, where content, layout and advertising are personalized and optimized using predictive algorithms that have been validated over billions of interactions, *complemented by our search offering that provides monetization solutions and capabilities to publishers' own products and services*."

49.    During the Class Period, Perion's revenue from its Search Advertising business ranged from 44% to 46% of total revenue and its revenue from its Display Advertising business ranged from 56% to 54% of total revenue. Perion disclosed the following revenue figures in its most recent Annual Report (with amounts in the thousands of dollars):

| | Year ended December 31, | | | |
| | 2022 | | 2023 | |
| | Amount | % of Revenue | Amount | % of Revenue |
|---|---|---|---|---|
| **Revenue:** | | | | |
| Display Advertising | $ 360,690 | 56% | $ 398,244 | 54% |
| Search Advertising | 279,566 | 44 | 344,911 | 46 |
| **Total Revenue** | 640,256 | 100 | 743,155 | 100 |

50.    Similarly, Perion disclosed in its 2022 Annual Report (also in thousands of dollars):

---

[4] Publishers in the field of internet advertising are entities that own websites, apps, or other digital properties. One way for online publishers to earn money is by allowing third parties to place ads on their properties. Publishers can include a search feature and earn revenue from ads that are displayed with the search results, either on the publisher's website or wherever the search is redirected to. *See* https://www.appsflyer.com/glossary/ad-publisher/.

| | Year ended December 31, | | | |
| | 2021 | | 2022 | |
| | Amount | % of Revenue | Amount | % of Revenue |
| Revenue: | | | | |
| Display advertising | $ 265,323 | 55% | $ 360,690 | 56% |
| Search advertising | 213,175 | 45 | 279,566 | 44 |
| | | | | |
| Total Revenue | 478,498 | 100 | 640,256 | 100 |

51.     Perion's 2022 Annual Report describes the Company's "Growth Through Search Monetization" strategy as follows:

> Our search monetization solution leverages our relationship with Microsoft Bing and other leading search and content partners, to drive innovation and revenue based on AI and analytic tools as part of our ongoing effort to provide comprehensive and compelling search solutions and monetization tools to diversified publishers around the globe. We do this through a variety of digital properties, including websites, apps, extensions and search engines.
>
> In addition to strategically diversifying our revenue sources and extending our products suite and partners, we are embedding our search functionality in our new products, thus increasing our monetization potential.

52.     What Perion calls "search monetization" means allowing its publisher clients—which it says includes websites, apps, extensions and search engines—to earn advertising revenue by having Microsoft's Bing search engine placed on their online properties.

53.     Perion explains that the Company's "Search Advertising Solution" is "composed of the following systems: 1. Publisher management system; 2. Search demand management system; 3. Monetization products; and 4. AI system," including:

**Monetization Products**

> Our monetization products are designed to deliver algorithmic search results concurrently with sponsored listings, both of which are served for the same search queries. They can be operationalized in different ways, including the transmission of search queries to search engines such as Bing, search Feed APIs operated on publishers' domains and an enriched and optimized hosted search results page which offers an enhanced user experience.

54.     The Company stated that in "2022, U.S. search advertising spend reached $101 billion and is expected to increase by 45% reaching $147 billion in 2026, representing 38% of U.S. digital ad spending, according to eMarketer." Perion described itself as well-positioned in this

market because "Search is the most intent-based form of advertising, as advertisements are served in direct response to the search queries, resulting in relevant advertisements yielding significant revenue to the search engine companies. ***Our search-related products address the market by engaging with premium search providers like Microsoft, and offer end users the ability to search the internet via easily embedded search functionality in a wide variety of publisher sites.***"

55.    Perion described its Search business as providing the same type of advanced technological tools as its other businesses. For example, it stated in its 2020 Annual Report that "[s]earching is a fundamental digital habit that will continue to grow. As the category grows, Perion is not standing still. We are continuously innovating, advancing our solutions to provide more value to our customers. We deploy advanced AI, neural networks, and machine learning to optimize yield for our publishers and transform search into revenues. . . . Our search monetization solutions are built to 'Capture and Convince' users more holistically and effectively than conventional search solutions."

56.    Similarly, Perion's 2022 Annual Report promoted Perion's "Growth Through ChatGPT," stating that "[r]ecently, Microsoft Bing announced the addition of ChatGPT to their search offering. . . . ChatGPT can open new monetization opportunities for our search offering. By integrating relevant ads into the conversation, we can provide a more targeted and effective advertising experience for our advertisers, leading to higher click-through rates and conversions."

57.    Perion, however, did not actually offer the types of sophisticated technological services that it represented. (*See infra* ¶¶ 134, 164-68, 175).

**C.    Perion's Contract With Microsoft Bing**

58.    Perion stated that it was "highly dependent on our search services agreement with Microsoft." The Company "entered into our first agreement with Microsoft in 2010" and renewed the agreement in November 2020 for four years. Perion disclosed that the "Microsoft Agreement

accounted for 37%, 35% and 34% of our revenue, in 2021, 2022 and 2023, respectively."

59.    In 2021, 2022, and 2023, Search revenue accounted for 45%, 44%, and 46% of Perion's total revenue, respectively. That means that Perion's agreement with Microsoft accounted for 82%, 80%, and 74% of Perion's Search revenue during those years.

60.    In November 2020, Perion announced that it "entered into a renewed agreement with Microsoft Ireland Operations Limited effective as of January 1, 2021 until December 31, 2024 which includes desktop and mobile distribution with limited exclusivity in the United States and an extended geography distribution." Upon announcing the deal, Perion estimated that its new four-year contract with Microsoft would yield $800 million in revenue from 2021 through 2024, and then starting on June 8, 2021 raised that estimate to $900 million:



61.    The Company promoted its relationship with Microsoft Bing as a core part of its business. When Perion announced the renewal of its contract with Microsoft in a November 2, 2020, press release titled "Perion and Microsoft Renew Their Strategic Partnership for Four

Years," it explained that "[t]he new contract is a major factor in Perion's path to achieve sustainable and highly profitable double-digit annual revenue growth going forward." The press release announced that the renewal would "drive search advertising business growth through Perion's search technology division, CodeFuel, and provide a more immersive experience across desktop and mobile."

62.     Perion describes CodeFuel as its "search technology division" that "provides monetization solutions for websites, extensions, apps, and search engines, helping publishers boost search advertising revenue through ads, shopping, and news products. CodeFuel enjoys a long-standing relationship with Microsoft Bing, and additional search partners and content providers."

63.     Perion misrepresented its publishers that sent search traffic to Microsoft as encompassing reputable websites and online tools that enable Microsoft's search service to reach "millions of potential customers." The Company stated when announcing the renewal of the Microsoft agreement that the "continuing collaboration" with Microsoft "will enable CodeFuel to further grow its publisher relationships offering, lucrative search technology solutions, and sophisticated expertise for monetizing their digital properties. These include shopping, product comparison and content websites, applications, browser extensions, mobile launchers, and white label search engines. Leveraging CodeFuel's publishers' network enables Microsoft to increase search advertising market share and connect advertisers to millions of potential customers while enriching user experience through publisher properties."

64.     This press release also quoted Defendant Gerstel, Perion's CEO at the time, as stating, "Since 2010, we have enjoyed a strong, close partnership with Microsoft, consistently delivering innovative search solutions in a dynamic market, *while maintaining high-quality standards and advertiser brand safety*… As we enter the next phase of our partnership, we are

confident that our complementary resources will continue to yield innovation and we are proud of the ability to help publishers monetize their traffic during all economic cycles."

65.     Defendant Jacobson, then General Manager of CodeFuel, said in this release, "[w]e are delighted to continue to work closely with Microsoft on Publisher Search Solutions for desktop and mobile. Our mission is to continue to empower publishers with advanced technology solutions to grow their businesses. An enhanced search experience has proven itself to be a predictable and valuable path for growth, both for our publishers and us… This collaboration will enable publishers to expand into new platforms and vertical search solutions for eCommerce, content, and news."

### 1.    Microsoft's Search Advertising Business

66.     In addition to using its Bing search engine on the Bing homepage, Microsoft allows third-parties to use Bing for search capabilities on their websites. Microsoft explains that its Bing search services allow its customers to "[a]dd search capabilities to your site with our suite of APIs [application programming interfaces] that enable searching via an API for Web, Images, News, Videos, Entities, Visual Search, Custom Search, Autosuggest and Spell."[5]

67.     Similarly, Microsoft's search advertising division (called Microsoft Advertising, and formerly called Bing Ads), states that "[p]eople enter search terms called keywords into search engines like Bing" and "[i]f the keywords in your ad match a search, your ad appears next to or above search results on Bing." It states that the "[s]earchers find the Microsoft Search Network on Bing and partner sites, through Windows 10, Cortana and Office, plus across third-party platforms and partnerships — whether it's search inside Amazon's devices, web results for Siri and Spotlight Search on Apple devices, or maps on thousands of leading websites."

---

[5] https://www.microsoft.com/en-us/bing/apis.

68.     Microsoft also explains that the "Microsoft Search Network consists of Bing and partner sites. It's where your business can reach a large and unique audience made up of millions of people who search every day. Use the advertising platform Microsoft Advertising to connect with these valuable potential customers."[6]

69.     Perion was one of the main distributors of Microsoft's Bing search technology to online publishers. (*See infra* ¶¶ 76-78).

### 2.     Perion's Reliance on Its Business With Microsoft

70.     The first capability that Perion lists in the Business Overview section of its Annual Report is "[t]he ability to monetize search traffic through our partnership with Microsoft Advertising (Bing), the effectiveness of which is reflected in the consistent growth of our publisher network."

71.     Perion promoted this relationship by noting that "Microsoft BING had 1.2 billion unique monthly global visitors as of May 2022, and delivered 14.7 billion monthly searches over PC as of June 2022. As of December 2022, Microsoft BING had 8.95% worldwide PC market share. In addition, it generated approximately $11.5 billion in revenue in the 2022 fiscal year."

72.     During the Class Period, Perion generated Search revenue—most of which came from its contract with Microsoft—"primarily from monthly transaction volume-based fees earned by us for making our applications available to online publishers and app developers on a revenue share basis relative to the revenue generated by such search partners."

73.     Perion stated that it "obtain[s] a significant portion of our revenue through the configuration of our search service as the default search provider during the download and installation of our publishers' products and/or use by their services of our search offering and the

---

[6] https://ads.microsoft.com/.

subsequent searches performed by the users thereof. . . . To achieve these goals, we heavily rely on third-party publishers to distribute and/or implement our search offering as a value-added component of their own offerings at a price sufficient to drive acceptable margins."

74.     Needham explained in an analyst report dated July 10, 2023, titled "Deep Dive: PERI's Search Revenue," that Perion "makes money in Search" by serving as "a distributor for Bing globally. That is, Microsoft has given PERI the right to put Bing on browsers, devices, and websites globally, for a share of the ad dollars on Bing's results pages." Needham provided an example whereby, if Firefox (a browser that used Bing as its default search engine) is Perion's customer, then "every time a consumer enters a keyword into the search box, Bing delivers results with ads" and Perion "gets a rev[enue] share of every Bing ad dollar earned on Firefox until the contract ends." Needham estimated that Microsoft keeps 15% to 25% of what advertisers pay for ads in search results and pays 75% to 85% of it to Perion. Perion then "typically keeps 25%-30% and pays out 45%-60% to the publisher." Needham also explained that Perion "gets paid a rev share of every ad on all Bing search results on that publisher/device/ browser, etc (ie, client) until the contract ends."[7]

75.     Perion's relationship with Microsoft was viewed as the Company's core strength. Needham recommended in this report purchasing Perion stock based on its assessment that Perion's "competitive advantage is that approximately 45% of its revs come from Search, through its partnership with Bing, which has rich first-party intent data signals."

76.     Needham also stated in this report its estimate that there "are a total of about a dozen total distributors for Bing globally" and "[w]e believe PERI is among the largest."

---

[7] Perion itself explains that it pays "traffic acquisition costs" to "publishers and developers who distribute our search properties together with their products."

77.    Moreover, Gerstel noted on Perion's earnings call for the fourth quarter of 2020 (held on February 9, 2021), while referencing its renewed contract with Microsoft, that "[t]he last one was for 3 years. This is a 4-year. For those who know Microsoft, doing a 4 years' agreement is, we are ***part of a very few vendors*** . . . able to really engage for such a long period of time."

78.    Then, on Perion's earnings call for the fourth quarter of 2022 (held on February 8, 2023), Gerstel promoted its position as a primary distributor of Microsoft's search products.[8] When discussing the effect of ChatGPT on Perion's business, Gerstel explained:

> ***Bing policy is to rely on a very limited amount of partners, which they certif[y]. We are one of them.*** We're not the only one, but it's a handful of partners. That's Bing policy. Now what they ask for each partner is to deal with hundreds of publishers and–… ***they expect[] from the partner as well as from us that we will screen all searches and we will deliver only quality searches because quality means searches with high intent***. Otherwise, Bing, as you know, Bing is charging the advertiser once they click on an ad, on any giv[en] search ad page or search results page.

79.    While Perion redacted large portions of its Bing Services Framework Agreement (effective January 1, 2021) that it included as an exhibit to its Annual Reports during the Class Period, certain components of the agreement are clear.

80.    The agreement defines "Ad Revenues" as revenues recognized by Microsoft "in connection with advertisements returned for Included Searches." Included Searches, in turn, covers internet searches tied to Perion that are run through "Bing Services," which "means the Microsoft service that provides Users internet search results in response to" internet searches. The agreement also covers internet searches that are "redirected" from their initial search to a Bing Service. Perion is able to offer its services under the agreement to "third-party publishers and channels" that it does business with.

---

[8] Similarly, at the 17th Annual Needham Technology & Media Conference, on May 19, 2022, Defendant Gerstel stated, when discussing Perion's relationship with Microsoft, that "we are one of their -- I can say, let's say top five vendor. I cannot say more than that."

81.    Perion would earn more revenue by working with more publishers because, as Lake Street Capital Markets explained (in a May 3, 2023 note titled "Results Continue To Separate Perion From The Pack, Upping Our Estimates; Raising PT to $40"), "[w]ith more publishing partners comes more search traffic."

82.    Analysts believed Perion that it worked with high-quality publishers to send search traffic to Microsoft. Lake Street wrote in an August 2, 2023 report ("Search Drive Outperformance, But Advertising Also Healthy, Raises 2023 Guidance") that Perion "delivers quality traffic to its search monetization partners, such as Microsoft Bing." Similarly, the Needham report noted above referenced the well-known companies Firefox and Lenovo when explaining Perion's Search business with Microsoft.

83.    Contrary to Defendants' representations throughout the Class Period, Perion relied on low-quality publishers—that dealt in fake users, clickbait, and non-monetizable traffic—for the searches it sent to Microsoft. Defendants' statements thus misrepresented the true nature of the Company's Search business and the risk that Microsoft would curtail its relationship with Perion because of the low quality of Perion's publishers.

84.    Even late in the Class Period, analysts viewed Perion's relationship with Microsoft as its key strength. Lake Street wrote in a November 1, 2023 report (titled "Growing Through Challenging Times, Search Revenue Up Substantially; Lowering PT To $36 On Multiple Contraction") that "Search Delivers Another Solid Quarter – Perion continues to distinguish itself vs other digital advertising names that have reduced their outlook. ***The main driver of the company's beat in the quarter was outperformance in the Search segment. Search revenue came in at $86.1M (+20%), roughly $6M above our forecast.*** Average daily searches of 31.3M grew 86% y/y. ***Search publishing partners now number 164, up 16% y/y.*** RPM was down y/y but flat

sequentially. With the company expecting strength in Search to persist in Q4, we took our previous estimate of 9% growth up to 14%."

85.     Perion's Search business, and its relationship with Microsoft, is so central to it that when Defendant Gerstel resigned from being the Company's CEO, Defendant Jacobson took his place because of his prominent role in that business.

86.     On February 8, 2023, Perion issued a press release stating that "Perion Names Tal Jacobson as Chief Executive Officer to Succeed Doron Gerstel Effective August 1st, 2023." The release explained that following a six-month CEO transition period, "Jacobson, currently General Manager of CodeFuel, Perion's search advertising business, will be promoted to CEO of Perion on August 1, 2023." Gerstel stated that Jacobson was the "ideal person to lead Perion forward" because he had "done remarkable work at CodeFuel. He has significantly modernized and enhanced our search advertising platform, driving our revenue growth and cash generation, while forging a strong and collaborative relationship with Microsoft Advertising."

87.     The release also stated that Jacobson "joined Perion in 2018 as the General Manager of CodeFuel, transforming Perion's search advertising, from a fledgling business unit in decline, into a significant driver of Perion's soaring market share and valuation, cementing the strategic relationship with Microsoft."

88.     Similarly, during the Company's February 8, 2023 earnings call, Gerstel discussed Jacobson's appointment as new CEO saying, "[u]nder [Jacobson's] leadership, CodeFuel, our search advertising [unit], we organized, modernized its technology infrastructure, and further developed our strong and mutually beneficial partnership with Microsoft Bing. What's more, CodeFuel technology has played an important role in the development of Perion's Intelligent Hub. Tal was instrumental in making that happen. As many of you have followed us and seen the growth

of our search and direct response business are aware, the performance has been superb. As GM, Tal drove that." Later on the call, Defendant Jacobson said "I'm the main contact with Microsoft, with the entire executives at Microsoft Advertising, have been for the past few years. I negotiated the last agreement and obviously I'll negotiate the next agreement."

**D.    Perion Depends on Low-Quality Publishers**

89.    Perion includes many buzzwords when describing its purported advanced technological capabilities that it offers to its customers. (*See supra* ¶¶ 41-45, 55-56). In reality, however, Perion's business relies on low-quality publishers. The Company thus suffered a substantial loss in business when Microsoft decided to limit, and then exclude, such publishers from its search business.

90.    On April 8, 2024, Perion issued a press release announcing preliminary financial results for the first quarter of 2024 and updated full year 2024 guidance, revealing that "[i]n the first quarter of 2024, Perion experienced a decline in search advertising activity, attributable to changes in advertising pricing and mechanisms implemented by Microsoft Bing in its Search Distribution marketplace." Perion further revealed that, "[t]hese adjustments led to a reduction in Revenue Per Thousand Impressions (RPM) for both Perion and other Microsoft Bing distribution partners" and "contributed to decreased search volume." The Company also revealed that for the full 2024 year, it now expects revenue in the range of $590 million to $610 million, down from the prior guidance range of $860 to $880 million the Company gave on February 7, 2024.

91.    On this news, the price of Perion common stock declined by $8.61 per share, or approximately 40%, from $21.11 per share on April 5, 2024 to close at $12.50 on April 8, 2024.

92.    Then, on June 10, 2024, Perion updated its second quarter and full year 2024 guidance, stating that "[i]n recent days, Perion was notified by Microsoft Bing of its decision to exclude a number of publishers from its search distribution marketplace. . . . As a result of these

actions, in addition to the changes in advertising pricing and mechanisms implemented by Microsoft Bing during the first quarter of 2024, search revenue from our agreement with Microsoft Bing is expected to represent less than 5% of Perion's revenue in the second half of 2024." These changes were so severe that Perion disclosed that "***our agreement with Microsoft Bing is no longer material to Perion***." Defendant Jacobson stated that "[t]he recent changes Microsoft Bing implemented to its Search distribution marketplace are unfortunate and significantly impacted our Search Advertising business." Perion thus lowered its second quarter revenue guidance to $106 to $108 million, and its full-year revenue guidance to $490 to $510 million.[9]

93.    On this news, the price of Perion common stock declined by $3.71 per share, or approximately 30%, from $12.32 per share on June 7, 2024 to close at $8.61 on June 10, 2024.

94.    Maintaining high-quality search traffic is crucial for Microsoft's search advertising business. Microsoft explains that the Microsoft Advertising Network shows ads on Microsoft sites (such as Bing, MSN, and Outlook), "[s]elect partner traffic with ad performance and conversion rates similar to Microsoft Bing's, such as traffic from Yahoo.com," and "[a]dditional partner traffic (including Microsoft Bing and Yahoo search partners, such as Ask.com, Forbes, and others) for extended reach and lower cost per click."[10] Perion's publishers that generate search revenue through its contract with Microsoft fall under the "additional partner traffic". (*See supra* ¶¶ 46-47, 72-74).

95.    Microsoft explains about its additional partner traffic that "Microsoft Advertising takes user, advertiser and network protection very seriously" and it tries "to ensure that the

---

[9] While this June 10, 2024, announcement stated that "[s]imilar notices were provided to other Microsoft Bing search distribution partners," that statement ignored that Perion was one of the largest and most important search distribution partners for Microsoft Bing. (*See supra* ¶¶ 76-78).

[10] https://help.ads.microsoft.com/#apex/ads/en/60146/0.

Microsoft Search Network provides quality traffic and a safe experience for our customers." It also states that it is "dedicated to protecting our marketplace from click fraud, conversion fraud, phishing, malware and maintaining our traffic quality standards." One of the specific methods that Microsoft uses "to help protect advertisers" is the "Removal of offenders: When we identify low-quality domains as a result of our proactive monitoring or reactive investigations, we reserve the right to remove those domains. We also employ industry standard IP black-listing methodologies." Microsoft also offers "price discounts" based on "the quality of syndicated partner traffic."[11]

96.    Click fraud is a significant concern in the online advertising industry. It is illegal and occurs "when an ad is clicked in a duplicitous manner without any real intent or interest in visiting the site or purchasing the service or product being advertised." Click fraud may be committed "to reduce competition among advertisers or to generate revenue by gaming the PPC [pay-per-click] advertising system." It can take place as a way to generate revenue in several ways, including when "publishers click on ads that have been placed on their own websites," by "hir[ing] low-cost employees—often located abroad—to manually click ads all day" in what are "known as click farms," using "scripts to automatically click on ads," or "by using computer viruses to surreptitiously take over a large number of computers and to have those computers click ads."[12]

97.    *Forbes* explains that "[c]lick fraud is a deceptive practice that plagues online advertising, costing businesses billions of dollars in wasted ad spend each year. By artificially increasing the number of clicks on digital ads through various illegitimate means—such as by having bots or individuals click on ads with no intention of engaging with the advertised product

---

[11] https://help.ads.microsoft.com/#apex/ads/en/60223/-1.

[12]    Click    Fraud:    Meaning,    Identifying    it,    Eliminating    it,    *Investopedia* (https://www.investopedia.com/terms/c/click-fraud.asp#:~:text=Click%20fraud%20occurs%20when%20an,service%20or%20product%20being%20advertised.).

or service—click fraud skews" data, "drains budgets, undermines marketing," and "erodes trust."[13]

98.    In addition to wanting to avoid click fraud, advertisers do not want to place ads in response to other types of low-quality traffic, such as searches resulting from clickbait or other types of non-monetizable searches. Microsoft's statement above makes clear that in addition to seeking to prevent click fraud, it tries to ensure that its "Search Network provides quality traffic," is "dedicated to . . . maintaining our traffic quality standards," removes "low-quality domains," and offers "price discounts" based on "the quality of syndicated partner traffic."

99.    The limits that Microsoft placed on Perion's publishers leading to the substantial decline in Perion's expected Search revenue that the Company announced in April and June 2024 were put in place to limit and exclude searches from low-quality sources.

**E.    Perion's Search Business Was Based on Low-Quality Publishers**

100.    Perion's use of low-quality publishers, whose payments Microsoft limited in April, and which Microsoft then excluded in June 2024, is corroborated by multiple sources.

101.    The Company's "Content Monetization Platform" allows its publisher customers to make money from searches and ads on their websites that Perion facilitates. Perion describes this service as providing "publishers with a strategic path to the future. In the face of declining revenues, we drive incremental growth with traffic that comes from Facebook, Taboola, Yahoo and other unquestionable sources." That traffic from other websites, however, comes from ads placed on those websites. Perion thus describes its "media buy costs" as consisting "of the costs of advertising inventory incurred to deliver ads." In other words, Perion assisted its publisher customers with generating profits from ad revenue derived from their websites that was larger than

---

[13] 11 Ways Agencies Are Combating Click Fraud In 2024, July 15, 2024 (https://www.forbes.com/councils/forbesagencycouncil/2024/07/15/11-ways-agencies-are-combating-click-fraud-in-2024/).

the cost of ads that those websites placed elsewhere to generate traffic to their sites.

102.    Perion derived revenue not only from searches and ads placed on its customers'
websites, but also from websites that Perion "owned and operated". For example, Perion stated in
its Annual Reports that it was "constantly looking for more ways to distribute our search offering
through various channels, including through independent distribution efforts of our owned and
operated products and services." Perion also discussed the "advertising inventory"—places where
ads can be placed—of "our publishers' and our owned and operated sites."

103.    Generating revenue from ads on a website is a common way for publishers to make
money on the internet. When that is the website owner's primary form of revenue and the website
draws users by enticing them to click on links placed in ads elsewhere on the internet, that is a
hallmark of low-quality websites that are often referred to as "clickbait" or "made for advertising"
sites. The revenue that Perion generated from its Search business came from such low-quality
websites—including third-party publishers that Perion assisted and low-quality websites that
Perion itself "owned and operated"—as well as from the other low-quality traffic described below.

104.    Indeed, in its 2023 Annual Report, published on April 8, 2024, when Perion
announced that Microsoft was reducing the amount it would pay for Perion's Search business, the
Company disclosed for the first time that "[s]ome of [its] supply inventory is known as 'Made for
Advertising' and is less attractive to or excluded by some of our advertising customers.
Restrictions from advertisers, DSPs or SSPs regarding usage of this inventory source have
impacted us and could materially adversely impact our operations and revenue." Perion also noted
that "advertising customers may pay less or exclude supply inventory on publishers websites that
are 'Made for Advertising'."

105.    Similarly, this 2023 Annual Report stated for the first time, when disclosing the

risk that the "generation of search advertising revenue through publishers is subject to competition," that "*[a]dditionally, traffic from low-quality sources, including websites with irrelevant content or poor user engagement have impacted and may negatively impact the effectiveness of our search advertising*."

106.    These warnings, at this late stage, did not fully disclose the extent to which Perion's Search business relied on low-quality websites and traffic. In fact, these statements did not even mention Microsoft. Indeed, Perion expressly discussed elsewhere in this Annual Report Microsoft's "changes [that] contributed to decreased search volume," without connecting those changes to Perion's Made for Advertising inventory or low-quality traffic. Moreover, other statements in this report, and Defendants' contemporaneous (or subsequent) statements, continued to promote the strength of Perion's relationship with Microsoft. These statements about low-quality traffic in the 2023 Annual Report thus did not disclose that the low quality of Perion's search traffic was so severe that Microsoft was on the verge of cutting their relationship to such an extent that it would no longer be material to Perion's business. Yet Perion's belated admission— concurrently with Microsoft's starting to limit their relationship—that Perion derived revenue from clickbait and other low-quality sources, in combination with the other revelations described below, corroborate that this type of activity constituted a substantial part of Perion's business.

### 1.    Microsoft Curtailed Its Relationship With Perion As The Company's Improper Practices Came to Light

107.    On April 4, 2024, in an article titled "Brands Paid for Ads on Forbes.com. Some Ran on a Copycat Site Instead," the *Wall Street Journal* reported that "[a]bout 11% of the $88 billion spent annually on open-web advertising goes to so-called 'made for advertising' sites that are overstuffed with ads and designed to fool advertisers." The article explained that although *Forbes* is a well-known publication, "for years [it] ran an alternate version of its website where it

packed ads that were intended to run on Forbes.com." This *Wall Street Journal* article referenced earlier findings from Adalytics, a company that helps brands monitor their online advertisements, which noted that the *Wall Street Journal* was investigating the issue since at least March 2024.

108.    Such "made for advertising" sites make money by running low-quality websites that contain an inordinate amount of ads. For example, the alternate *Forbes* site described in this article, which used the web address "www3.forbes.com," contained "stories from Forbes.com that were stretched into formats that can fit many more ads, like slideshows and articles written in a list format, known as 'listicles.'" One "700-word article was turned into a 34-slide slideshow, exposing the person who read it on a computer to about 150 ads instead of around seven for someone who read the original piece."

109.    These reformatted articles are "promoted through content-recommendation companies" that "place paid links to clickbait-style content at the bottom of many sites." Websites containing these types of articles provide a lower-quality experience to users and less-desirable advertisements to advertisers, who "said the ads on the alternate site weren't worth what they paid because they reached a different audience and appeared on overcrowded pages."

110.    "Made for advertising" websites are often referred to as clickbait because they make money by placing ads around the internet that lure users to click on them. These websites then seek to make more money from the large number of ads on their low-quality sites than they pay to draw users to them. Such websites are therefore also referred to as "made for arbitrage," because they seek to arbitrage the difference between what they pay to garner views and what they receive for the many ads that are placed on their sites. Adalytics explains that "[a]dvertising industry trade groups consensus defines Made for Advertising (MFA) websites as sites that are created primarily for the purpose of arbitrage. These websites typically feature low-quality content

with a much higher density of ad placements."[14]

111.    This issue has garnered significant attention recently, leading to major companies in the online advertising industry curtailing such practices. For example, the Adalytics article noted above explains that a June 19th, 2023 research report from the Association of National Advertisers (ANA), titled "ANA Programmatic Media Supply Chain Transparency Study," found that "21% of overall ad impressions occur on MFA sites, and advertisers do not have control over their media placement decisions." Following the publication of that report, "many ad tech vendors and media agencies issued public statements on actions they have taken to reduce brands' ad placements on 'Made for Advertising' websites." Perion, however, did not disclose at that time its reliance on these types of websites.

112.    Adalytics found that the problem is still rampant in 2024, with companies placing online ads, including "hundreds of major brands," often having their ads placed on low-quality made for advertising sites "through programmatic and non-programmatic channels," even though these advertisers do not want their ads placed on such websites.

113.    This issue has garnered even more attention recently, including through the April 4, 2024 *Wall Street Journal* article noted above revealing that even well-known brands such as *Forbes* make money through alternate made for advertising sites.

114.    Perion drew a significant amount of revenue from such practices. On May 10, 2024, Sincera, which provides services to the online ad tech industry, conducted an investigation following up on the news that *Forbes* ran an MFA site. Sincera explained that MFA sites provide especially low-quality ads to companies that advertise on them because the internet users that visit them "have no affinity to the property they're visiting - they are 'rented' from paid traffic, in effect,

---

[14] https://adalytics.io/blog/ads-observed-on-made-for-advertising-sites-in-january-2024.

pure arbitrage on low value, 'clickbait' style content." Moreover, "MFA properties actively try to obscure their aggressive ad experience via variable ad loading (VAL), which dynamically changes ad load depending on the traffic source."[15]

115.    Sincera explained that MFA sites, like *Forbes*'s alternative site, which use web addresses that are subdomains of a well-known company's main website, "add a new, undesirable behavior to the mix: they have an association with a legitimate, high value top level domain, like forbes.com or spin.com, so MFA subdomains trojan-horse their way into programmatic campaigns, because media buyers consider Forbes and Spin to be high value properties (and Forbes.com + Spin.com are!) - with the media buyers not realizing that recommended.spin.com is a completely different ad and content experience, effectively laundering an entirely different property under the cloak of a respectable, well-known media property."

116.    In addition, well-known companies sometimes allow third parties to operate their clickbait subdomains. In such situations, the website is fully hosted by a third party that manages the "traffic acquisition and ad arbitrage" (*i.e.*, placing ads elsewhere on the internet to draw users and then selling adds on the MFA site), as well as the content on the site, in exchange for the original owner of the subdomain "collect[ing] a share of ad spend that subdomain generates."

117.    Sincera named Perion's Content IQ division as the primary perpetrator of these clickbait practices, for both third-party websites and websites that Perion itself owned.[16] The article noted that "ContentIQ (CIQ) is the owner of well-known MFA sites, such as boredomtherapy.com and eternallysunny.com." Sincera found that "a number of well-known publishers pointed one or

---

[15] https://www.sincera.io/blog/detecting-resold-mfa-subdomains-at-scale.

[16] Sincera explains that such "resold" subdomains also exhibit the other characteristics of MFA sites, including that "[t]he primary source of user acquisition is paid traffic"; "[t]he property dynamically changes the ad to content ratio (A2CR) based on referral (high A2CR when visited from a paid traffic referral, low A2CR when visited organically) in an effort to evade ad verification technology": and "[t]he A2CR values for paid traffic is very high, with 4-5 ads in view and A2CR approaching 50% or more of the viewport."

more subdomains" to Content IQ. "This effectively means that these URLs . . . were hosted and controlled by Content IQ, and not by the owner of the top-level domain." These websites exhibited the characteristics that Sincera described as defining MFA sites and "look and feel . . . completely different" that the main websites of the publishers at issue. Furthermore, the content on these websites did not come from the publishers whose names were being used in the web addresses, but rather, was "republished from CIQ's owned and operated domains," which also shared "a similar layout and infrastructure" with Content IQ's owned and operated MFA websites. Perion drove users to these sites by purchasing ads on Facebook with clickbait titles like "Weird Little Tales" or "Best Projects".

118.    In addition, Sincera found that there were "a number of large publishers who previously worked with CIQ [Content IQ] for subdomain services," including: Gannett (USA Today), Newsweek, Vice (Refinery29), Spin, Group Nine / (now Vox Media, Popsugar), and Dailymotion. Sincera also noted that "[w]hile this blog post was in production, a number of previously live CIQ subdomains were abruptly pulled offline around April 11th."

119.    These events coincided with Perion's announcements on April 8 and June 10, 2024, that Microsoft was curtailing its relationship with the Company's Search business.

120.    During the Class Period, however, Perion promoted that its "content monetization solution" dealt with reputable publishers, such as *Newsweek*—one of the publishers that Sincera highlighted—without disclosing that Perion actually ran low-quality clickbait sites for them.

121.    An article on Ad Exchanger on May 14, 2024, titled "Shadier Than Forbes? Premium Publishers Are Partnering With Content Farms To Make A Quick Programmatic Buck," elaborated on Sincera's findings.[17] This article explained that "[w]ell-known, legitimate publishers

---

[17] https://www.adexchanger.com/publishers/shadier-than-forbes-premium-publishers-are-partnering-with-content-farms-to-make-a-quick-programmatic-buck/.

. . . currently or very recently partnered with third-party vendors that generate programmatic ad revenue from paid traffic via Facebook ads. The resold subdomains are jammed with recycled MFA articles produced by notorious content farms." The article highlights Content IQ recycling an article from its MFA site "historicalgenius.com" on "a subdomain associated with premium music publisher SPIN – yet, weirdly, hosted by Content IQ." As Ad Exchanger explains, "[t]hese publishers traded on the good reputation of their long-standing top-level domains," with Content IQ "manag[ing] all paid traffic acquisition and arbitrage that happens on these subdomains." Because companies involved in buying and selling online ads "take their cues from top-level domains rather than subdomains, they may mistakenly label resold MFA subdomains as quality inventory." But whereas the main website for Spin "feature[s] the high-quality music and news content one would expect to find there – as well as a normal ad load – the subdomains monetized by Content IQ" and another company "contain your garden variety ad-ridden MFA mélange."

122.    For example, for "SPIN, Content IQ cribbed random articles to populate these subdomains directly from its so-called portfolio of media brands, including Historical Genius, Boredom Therapy and Pets Fanatic." Content IQ did this by "pour[ing] money into Facebook ads to drive visits to the subdomains, which generate virtually zero organic traffic."

123.    These MFA websites run by Content IQ are even worse than the alternative Forbes website that the *Wall Street Journal* uncovered. "[A]t least Forbes was repurposing its own content for the slideshows and cluttered clickbait . . . . By contrast, all the articles running on the resold subdomains discovered by Sincera are republished MFA posts pulled from other low-quality sources that have no association with the legit publisher whatsoever." Moreover, the "ad experience on a resold MFA subdomain is sloppy and aggressive, with a heavy ad load and frequent refreshing. The content is both subpar and confusing." This includes "every MFA

hallmark, including an overuse of images and a high ad-to-content ratio. It takes more than a minute of active scrolling to even get to the bottom of the page except, whoops – there is no bottom. The page is an infinite scroll of MFA and chum." The "outlandishly heavy ad load . . . clocked in at more than 3,000 ad requests on a single page in less than 60 seconds."

124.    This recent attention has forced Content IQ to halt these deceptive practices contemporaneously with its lowering of its revenue guidance. For example, "[a] SPIN spokesperson told AdExchanger the publisher has now 'terminated our relationship with Content IQ and are in the process of shutting down subdomains they operated.'" Similarly, the International Business Times and Benzinga "were actively outsourcing their subdomains to third parties for ad arbitrage until just shortly after the Forbes scandal broke in April."

125.    Perion purchased Content IQ for approximately $73 million in January 2020. As recently as Perion's 2023 Annual Report (filed with the SEC on April 8, 2024), it described Content IQ as having "created data algorithm and analytics tools that deconstruct content, revenue and distribution to solve digital publishing challenges." Perion stated in this filing that "[t]hrough Content IQ, we provide advertisers the ability to serve advertisements which are targeted to the end-user's interests alongside relevant optimized content and page-level reader engagement. Our solution includes a technology platform for buying media on social and mobile platforms which helps optimize the money spent by agencies and advertisers. In turn, we also provide the publisher a solution for creating new advertising inventory and increasing their revenue."

126.    Yet, on May 12, "less than two days after Sincera published its research, Perion … quietly and briskly shut down Content IQ's entire MFA network" and fired its content producers. Ad Exchanger reported that Content IQ's website now results in an error message and its "LinkedIn page was removed, and all of the websites under its umbrella are offline, including

Boredom Therapy, Film Oracle, Honest to Paws, Historical Genius, Pets Fanatic, Eternally Sunny, NightDaily, The Atlantic Mirror and Mental Flare." Ad Exchanger concluded that "now that the online ad industry has elevated the fight against MFA into a cause célèbre, clickbait-as-a-service could become less lucrative. And Content IQ's demise is evidence that sunlight works as a disinfectant, especially when a business practice becomes embarrassing enough."[18]

127.    Perion told Ad Exchanger that the Company "launched its new brand on May 8, 2024, focusing on technologies for advertisers. As you can see on our site, and in the investor presentation we gave on May 8, Content IQ's legacy activity and brand is not part of Perion's strategic focus." This justification, however, does not explain why Perion waited until after Content IQ's MFA practices were exposed—and after Microsoft began scaling back its relationship with Perion because of these types of practices—to shut down that business line.

128.    A June 10, 2024, article on *Seeking Alpha*, titled "Perion Network: Clickbait Disaster," explains that Microsoft excluded Perion's publishers because "Microsoft Bing is apparently cracking down on so-called 'Made for Advertising' or 'MFA' sites - content farms with a poor user experience designed solely to maximize ad spend." The article connects this to Perion having "shut down its MFA site network" in May 2024 after its "practices had been exposed in an industry report."[19] The article noted that "[l]eading industry players [were] . . . now blocking these sites, making it more challenging for them to benefit from their deceptive practices." Perion, however, did not tell investors that its business depended so heavily on MFA websites.

129.    This *Seeking Alpha* article also noted that with Perion's "MFA site network shut down and the company now being excluded from Bing's search distribution marketplace, Perion

---

[18] https://www.adexchanger.com/publishers/perion-shutters-content-iq-its-made-for-advertising-division/.

[19] https://seekingalpha.com/article/4698481-perion-network-clickbait-disaster.

no longer generates revenues from these activities and consequently lowered its top-line guidance by another 100 million. Quite frankly, it's disappointing to see that the company's strong growth and decent profitability recently was at least partially the result of an aggressive MFA strategy." Overall, "[w]ith the key Microsoft Bing relationship essentially dead, Perion . . . will have to rely on its low-margin advertising business going forward, which is apparently facing headwinds resulting from the search division disaster."

130.    The decline in Perion's relationship with Microsoft also resulted from Perion's dealings with MFA websites because Perion's revenue from Microsoft came from searches run on the websites of Perion's publisher network (*see supra* ¶ 48), which was overrun with these low-quality websites. Defendant Gerstel made this connection clear on Perion's earnings call for the fourth quarter of 2020 (held on February 9, 2021), when he promoted the purported benefits of the recently acquired Content IQ division as coming "not just on what they able to generate, but also as the synergy, I would like to focus on the synergy capability" from having the websites that they do business with—including ***"first tier publisher[s]" such as Newsweek***—contributing to "the ***demand that can be generated from our partnership with Microsoft Bing***." He also explained that adding websites from Content IQ to Perion's business allowed Perion to reduce its traffic acquisition costs ("TAC") by having Search traffic come from these "in-house" sources rather than having to pay third parties for traffic. Adding these publishers thus allowed Perion to increase both its "demand capability" and its "supply capability," giving it a "great opportunity to definitely reduce our TAC and which will increase our margin." Gerstel also stated on this call that adding these supposedly "first-tier" websites to Perion's network "created a great, large supply," that

"definitely can be a great opportunity for other business unit[s] that generate demand."[20]

131.    Perion also explained that providing search services to its publishers was part of the Company's broader "content monetization" services that included these clickbait practices. For example, Perion stated that its advertising services were "complemented by our search offering that provides monetization solutions and capabilities to publishers' own products and services." (*Supra* ¶ 48). Similarly, Perion was "constantly looking for more ways to distribute our search offering through various channels, including through independent distribution efforts of our owned and operated products and services." (*Supra* ¶ 102). Moreover, Perion promoted its centralized iHub as connecting all facets of its business, including Search. (*See supra* ¶¶ 41-42 and *infra* ¶¶ 261, 265). The Company also explained in its Annual Reports that its iHub serves as a "cross-company data layer" that "provides significant value to our publishers, delivering more opportunities to monetize their inventory and generate incremental revenue" through Perion's "unified platform [and] multiple ad products, from different business units." The websites in Perion's network that engaged in clickbait practices therefore supported Perion's Search business.

## 2.    Confidential Witnesses Corroborate Perion's Low-Quality Publishers

### a)    CW 1

132.    Confidential Witness 1 (CW 1) worked on the Sales team at Perion's CodeFuel division from February 2022 to August 2023. CW 1's role was to find new publisher clients for CodeFuel.

133.    CW 1 reported to Amit Gelber, who was the Chief Revenue Officer and Head of

---

[20] On this earnings call, Gerstel also discussed Pub Ocean, which Perion describes as a digital publisher-focused technology company with scalable content distribution. When Perion acquired Pub Ocean in July 2020, shortly after it acquired Content IQ, it described Pub Ocean as enhancing Content IQ because they both dealt with Perion's content monetization services. Perion thus referred to Content IQ and Pub Ocean together, as part of the same business line.

Sales for CodeFuel. CW 1 stated that Gelber was aware of everything happening at CodeFuel. Gelber reported directly to Defendant Jacobson, who reported to Defendant Gerstel. Defendant Gerstel, in turn, reported to the Board of Directors.

134.    This witness stated that most of Perion's revenue came from CodeFuel and most of CodeFuel's revenue came from Perion's agreement with Microsoft. CW 1 stated that for years, CodeFuel was trying to reduce its dependance on Microsoft, so it tried to develop new products, but those efforts (such as developing a product for mobile phones) failed.

135.    CW 1 explained that Perion's contract with Microsoft related to its Search advertising business. Perion's Search business under the Microsoft agreement came from sponsored ads displayed in Microsoft's Bing search engine in response to keyword searches conducted with CodeFuel's publisher clients. This also includes searches on Yahoo's search engine because Yahoo receives its search results from Bing. The relationship with Yahoo was therefore part of the contract with Microsoft.

136.    The publishers that were CodeFuel's clients that sent traffic under the Microsoft agreement included browser extensions, mobile and desktop apps, and websites, which contained a search function or changed the user's search engine settings. For example, CW 1 noted a browser extension that provides weather updates and also provides the ability to conduct searches. CW 1 noted that internet users often install browser extensions accidentally and do not realize that they are there.[21]

137.    CW 1 explained that the Microsoft contract provided that Perion's publishers that

---

[21] A browser extension is a "piece of software that performs a function or adds a feature to a browser client." Extensions from untrusted sources pose security risks as "attractive targets for attackers" and because they may employ "tracking info or data sharing" and other "malicious content." *See* https://security.berkeley.edu/education-awareness/browser-extensions-how-vet-and-install-safely.

sent Microsoft traffic had to meet Microsoft's rules and standards for traffic quality. Microsoft would have to approve publishers before they could be added. Under their contract, Microsoft could block specific publishers that Perion worked with. Microsoft would audit Perion's publishers twice a year and exclude publishers that appeared to provide a significant amount of junk traffic.[22] The contract with Microsoft provided a limit of violations for invalid traffic. Under the contract, if Perion exceeded 10 to 12 violations per year for publishers with junk traffic, it would be breaching the agreement. CodeFuel had a QC (quality control) department whose job it was to make sure that Perion was not reaching that limit. It was very important to CodeFuel that it be in compliance with the Microsoft contract because it would be very harmful for Perion to lose its business with Microsoft. CodeFuel would therefore exclude publishers if it appeared to the QC department that they would end up being blocked by Microsoft. Doing this served two purposes for CodeFuel. First, it helped to avoid Microsoft declaring Perion in breach of their agreement. Second, it prevented publishers from being banned by Microsoft. If Microsoft blocked a publisher, CodeFuel would then close the account and that publisher would be banned. By CodeFuel catching them first, it could avoid having them be banned in the future. So the goal was to not have Microsoft close the account. From its audits, in some years, Microsoft blocked between five and nine publishers per year for providing junk traffic. CW 1, however, described how the Sales department evaded Microsoft's ban on junk traffic. CW 1 described the practice as CodeFuel making it look wonderful even though a substantial portion of its traffic was junk.

138.    CW 1 explained that CodeFuel's employees were careful to not have publishers that would be found to violate Microsoft's rules for traffic quality. But the witness described these efforts as "all one big 'kombina,' to do manipulations on everything." (Kombina is slang in

---

[22] This is consistent with how Microsoft describes its search advertising business. (*See supra* ¶¶ 68, 94-98).

Hebrew for a trick or a shady scheme.) As the witness explained, the purpose of these practices was to make everything look formally valid under the contract with Microsoft, even though CodeFuel's publishers were largely sending junk traffic. CW 1 stated that everyone at CodeFuel knew it was rubbish or nonsense. The witness explained that while some of CodeFuel's publisher clients were legitimate, the ones that were not legitimate accounted for a significant portion of the search traffic sent to Microsoft.

139.    CW 1 also explained that it was "comfortable" for Microsoft to have a third party such as Perion handle Microsoft's traffic. That way Microsoft could "turn a blind eye" to the true level of junk traffic. Otherwise, it did not make sense for Microsoft to pay a third party to obtain its traffic.

140.    CodeFuel used several practices to make its publishers appear valid to Microsoft even though they largely provided junk traffic. One tactic that CW 1 explained was that when publishers were blocked, either by Microsoft or by CodeFuel's QC department, the Sales department made CW 1 understand that he or she should evade that exclusion by reincorporating the publisher as a different, straw man company (for example, in Cyprus or Wyoming), under which the blocked client would then continue to operate. CW 1 stated that Perion did this over and over again, approximately 200 times.

141.    CW 1 described this practice of reincorporating blocked publishers under a different name as an extremely common practice among CodeFuel's employees, which the witness stated was "spoon fed from management." CW 1 estimates that 10% of CodeFuel's publishers were reincorporated several times. Moreover, the witness stated that these publishers were serious players and brought in a lot of traffic. CW 1 estimated that these publishers brought in least 30% to 40% of the traffic under the Microsoft Agreement

142.    This witness described CodeFuel's salespeople as being incentivized to do this because they received commissions for their sales. CW 1 described these practices as similar to municipal corruption, where everyone is paying each other, and no one says anything because they all have their own interests. In addition, CW 1 stated that everyone at CodeFuel knew that most of its traffic was garbage.

143.    CW 1 explained that the junk traffic referenced above that CodeFuel's publishers sent in violation of the Microsoft agreement was fake traffic that came from fake internet users, such as click-fraud. CW 1 estimates that 50% of the traffic that CodeFuel sent under the Microsoft agreement was this type of junk traffic. The witness stated that everyone at CodeFuel knew it was garbage.

144.    In addition, CW 1 described how Perion's publishers sent junk traffic to Microsoft. The witness described Perion's publishers as providing junk traffic in "dark" ways. CW 1 explained that publishers who know how the system works can mix invalid traffic with valid traffic without being discovered. Some of these publishers had just a few, as few as 10, legitimate users. They would get approved by Perion and Microsoft based on that small number of legitimate users and then, after they were approved, they would mix in junk traffic. They were using the legitimate users to launder the garbage traffic. This witness stated that CodeFuel had dozens of such clients. CW 1 described this as the publisher "does what he does" behind the scenes and Perion's employees can feign ignorance. The witness stated that everyone at CodeFuel knew this was happening. Periodically, Perion had to block clients, such as if they had a sudden spike in traffic that would be easily flagged as junk, or if they were blocked as a result of Microsoft's inspections discussed above. But Perion's Sales team members then assisted these clients to reincorporate under a different name.

43

145.    Another type of business that CW 1 described under the Microsoft agreement was "arbitrage," which involved putting ads and search boxes on low quality websites, or clickbait, such as a horoscope website. This witness stated that "[t]hey did what they did and no one asked questions," but this practice got bad press for Perion. CW 1 estimated that this generated approximately 15%-to-20% of CodeFuel's revenue, which was not enough, so they closed the department. Over time, it was getting harder and harder to get these types of publishers approved by Microsoft. But CW 1 explained that different publishers routed traffic through each other, so if you could not get one publisher approved, then the traffic could be routed through a different publisher. More recently, Microsoft demanded there be a product attached to Perion's publishers, instead of just a website. But there were still legacy agreements with Microsoft for websites that continued to operate. These legacy websites continued to be publishers under the Microsoft agreement. There was garbage traffic going through these websites.[23]

146.    Yet another way that CodeFuel's publishers sent junk traffic to Microsoft was through VPNs.[24] This was another way that CodeFuel tried to increase its business. CodeFuel pushed for a while for Microsoft to approve VPN publishers. Microsoft allowed them only if the VPN was turned off because the VPN would mask where the traffic was coming from. CodeFuel therefore built an algorithm that would not monetize the VPNs when they were turned on. But CodeFuel was able to control that and turn it back on without Microsoft knowing. The code that CodeFuel gave to Microsoft looked legitimate, but CodeFuel then changed it without Microsoft knowing, even though Microsoft was not supposed to pay unless the VPN was off. Amit Gelber

---

[23] CW 1's description of these websites is consistent with Content IQ's clickbait practices described above. (*See supra* ¶¶ 114-27).

[24] A VPN is a "virtual private network" that allows users to mask their identity by making "the IP address that's visible to the internet . . . that of the VPN server and not your actual one, effectively masking your real    IP    address."    *See*    https://www.forbes.com/advisor/business/software/what-does-vpn-hide/#:~:text=A%20VPN%20can%20mask%20your,to%20pinpoint%20your%20exact%20whereabouts.

said that this was a way to legitimize traffic. But CW 1 noted that it was defrauding Microsoft.

147.   CW 1 described these practices as a whole, through which Perion's publisher clients sent junk traffic to Microsoft, as a "cat and mouse" game between CodeFuel's QC and Sales departments. The QC department would track publishers' traffic. Their role was to stop a publisher when they recognize a sudden and substantial increase in traffic from a certain publisher. To avoid being caught by the QC department, salespeople would build a relationship with the publisher and assist them to gradually increase their traffic so that it would not be flagged as junk traffic.

148.   Separate from fake traffic discussed above, which CW 1 described as being junk, an additional approximately 20% of the traffic from CodeFuel's publishers came from actual users, but was low quality because it could not be monetized since it came from geographic regions (such as Egypt and India) that had very little value. Microsoft was aware of this traffic and paid very little (just a few cents or nothing) for it.

149.   In addition, CW 1 explained that companies typically have separate departments for Sales and Customer Success. Once a client enters into an agreement, they are usually transferred from the Sales department to Customer Success. At CodeFuel, although there was a Customer Success team, publishers were not transferred there until after they reached a certain threshold that was unusually high as compared to other companies. In addition, even after publishers were transferred, the sales manager still had the option to hold on to the client and to continue to work with them for a longer period than usual. A salesperson would therefore continue handling a client for as long as possible to maintain control and a direct relationship with them without intermediaries. The salesperson could then slowly build up the customer's traffic to avoid detection.

150.   CW 1 also noted that even Perion's legitimate publishers provided a certain amount

of junk traffic. For example, one of Perion's publishers was Avast, an anti-virus company. When users downloaded its software, they could opt to make Bing their default search engine. While Avast received users' consent for the change, the users probably did not understand what they were agreeing to. Avast has over 400 million users. CW 1 explained that even though Avast was a legitimate publisher, it could still have a lot of junk traffic. CW 1 stated that "[t]here is no doubt that funny business was going on in the Avast account." It was a running joke in the office that why else would a company like Avast, with 430 million users, work with Perion instead of working directly with Microsoft? This was because a lot of traffic could be games they're playing.[25]

151.    CW 1 described all of these practices related to junk traffic as common knowledge in CodeFuel. The witness stated that the spirit in the Company's offices was that the traffic it was sending to Microsoft is junk, but we will go forward with it. In addition, the witness stated that "people were smart enough to know when to leave the room." CW 1 also described CodeFuel's employees, including its top managers, as all "playing the game." The witness also stated that salespeople knew about these practices, noting that they were receiving commissions for sales. For

---

[25] Avast has been found to engage in misconduct related to its users. Many users have complained that Avast changed their search engine or browser, or that Avast was acting like the malware that it was supposed to prevent. For example, a post on the Avast Forum (an online forum for Avast users) that was read over 41,500 times (as of September 16, 2024), complained that "Avast keeps changing my search engine" away from the user's preference of Google. *See* https://forum.avast.com/index.php?topic=151003.0. In addition, on June 27, 2024, the Federal Trade Commission announced that it finalized an order requiring Avast to pay $16.5 million and "banning software provider Avast from selling, disclosing, or licensing any web browsing data for advertising purposes to settle charges the company and its subsidiaries sold such information after promising that its products would protect consumers from online tracking." The FTC's allegations included that Avast "has been collecting consumers' browsing information through browser extensions, which can modify or extend the functionality of consumers' web browsers, and through antivirus software installed on consumers' computers and mobile devices" and that unfairly sold this data "without adequate notice and without consumer consent." *See* https://www.ftc.gov/news-events/news/press-releases/2024/02/ftc-order-will-ban-avast-selling-browsing-data-advertising-purposes-require-it-pay-165-million-over; https://www.ftc.gov/news-events/news/press-releases/2024/06/ftc-finalizes-order-avast-banning-it-selling-or-licensing-web-browsing-data-advertising-requiring-it

example, CW 1 described a sales manager who was at the Company for 10 years and oversaw customer success as knowing every trick.

152.    CW 1 stated that the message that Gelber gave at meetings with the whole company was to comply with the Microsoft agreement. But then a different message was given at one-on-one meetings or meetings with just a few people. The practice noted above of reincorporating a banned publisher under a different name was discussed in these smaller meetings. Everybody at CodeFuel knew everything about what was going on.  CW 1 also noted that Defendant Jacobson was head of CodeFuel before he was Perion's CEO, so he had to know and there was no way he didn't know.

153.    This witness also stated that Gelber (who reported to Jacobson) 1,000% knew about these practices and that Gelber knew about every possible "kombina". In addition, the witness explained that Gelber not only knew about these practices, he "invented the games" and he "taught the games". CW 1 also noted that he or she spoke with Gelber about these issues, who did not deny them. If a client was blocked by Microsoft, Gelber would not say directly to start a new company for that client , but he would convey the message in a suggestive or implied manner. For example, Gelber would say something like, what is the problem that they will start a company in Cyprus?

154.    CW 1 also noted that Jacobson, Gerstel, and Gelber all had a direct relationship with Microsoft. CW 1 assumes that Microsoft's change in policy as to Perion's customers that was announced in 2024 was because someone more senior at Microsoft "woke up" and realized what is going on, that it is all one big "kombina" (trick or scheme). The witness stated that in between the lines, it can be understood that Microsoft realized that the traffic is junk.

*b)*    ***CW 2***

155.    Another confidential witness, CW 2, worked for Perion's Content IQ division from August 2021 to August 2022 as a Product Manager, and reported to the Vice President of Product

and Monetization and to the Chief Operating Officer of Content IQ.

156.    CW 2 said that Content IQ was an "ad arbitrage" business that ran "made for advertising" (MFA) sites. CW 2 explained that Content IQ would "write long articles that lead you on," which "would have a light layout in the beginning" but as readers would scroll they would become inundated with ads that ranged from 90 to 200 ads per session. CW 2 emphasized that "advertisers hate this" because it "degrades the quality of the ad inventory." The witness continued by explaining that Content IQ had 80 domains at one point, aimed at making as much money as possible on them before they were discovered and became banned.  Once a site was banned, the company would just "make new domains and start over." CW 2 described Content IQ's websites as "getting trashed because of poor quality." Content IQ also partnered on MFA practices with "big publications" such as Vice, Newsweek, and Entrepreneur that "had better rates on ads." While this initially began as a side business it turned into a "main thing" for Perion and became the "Wildfire" business.

157.    However, CW 2 explained, Content IQ began running into trouble once the industry "turned against" MFA practices following the publication of news and industry articles criticizing the practice, including an April 2024 *Wall Street Journal* article accusing Forbes of selling MFA media to brands as if they were legitimate high-quality ads.[26] Many of Content IQ's publication partners were "sketched out" after this article was published, resulting in Perion losing several clients, including Newsweek. Content IQ was eventually "completely shut down" as a result of the mechanics of its MFA practices being exposed.

158.    The witness added that Perion used its other businesses to place ads for Content IQ's MFA websites. Specifically, CW 2 said there was "a lot of pressure to show Undertone ads

---

[26] CW 2 thus confirmed Content IQ's clickbait practices discussed above. (*See supra* ¶¶ 114-27).

on Content IQ," Perion's digital advertising platform.  CW 2 described Undertone ads as being "really, really aggressive" and known internally as "the session killers" because they were "intrusive."  These ads took up a big portion of the screen and CW 2 said that they don't "work at all" and that a lot of companies did not want to run them because of how intrusive they were.

159.    Furthermore, the witness said that CodeFuel did "click to search arbitrage" which involved buying a click from one search engine, such as Google, and then selling it to another, such as Microsoft Bing, at a slightly increased price per click. This practice was "not providing any value" to customers and instead was "just taking users from one search engine to another."

160.    Additionally, CW 2 heard that the search traffic generated by CodeFuel "was not always the best quality" and might have involved "bots," including "Russian bot farms." As for Perion's relationship with Microsoft, CW 2 said that Perion was like a "legitimate player in place" so that "sketchy people" could use it "to work with Microsoft."

161.    CW 2 was skeptical that AI capabilities would assist Perion in any way given that it decreases traffic from advertisers because users can get their answer right away and do not have to click around to find it.

162.    CW 2 added that "if you wanted to find out what Content IQ did based on their filings, you would not find that. You would learn more from ad-tech publications than from filings."[27] Along the same vein, CW 2 described Perion as "extremely dishonest" and questioned how Perion gets away with its misrepresentative filings.  CW 2 also said that Perion had tendencies "to kind of make things sound nice" and "come up with interesting names for things."

### c)    CW 3

163.    Confidential Witness 3 (CW 3) was a Client Partner/Client Solutions Manager at

---

[27] *See supra* ¶¶ 114-27 for a discussion of such ad-tech publications.

Perion's Undertone division from February to August 2021. CW 3 worked on both the "pre-sale" and "post-sale" side of Undertone's advertising business, mostly with "digital ad formats," including connected TV and online display, most of which were "programmatically done." CW 3 was involved in "pre-selling ad units" to ad agencies and other clients. The witness was also part of the "post-sale" process, which involved "managing campaigns purchased by companies."

164.    CW 3 left Perion because CW 3 "struggled" with the fact that Undertone was operating in a way that was "not by the book." One specific incident that led to CW 3's departure was when CW 3 worked with a sales colleague who was "selling faulty placements," which CW 3 could not see eye to eye with.

165.    CW 3 explained that there were several aspects of the "programmatic" and "online display" facets of Undertone's advertising business that were not "done by the book." First, in order to "cut corners," Undertone ran ads on websites that "don't have much traction" and "weren't actual respected websites." CW 3 explained that in the advertising industry, a company normally comes up with a list of websites aimed at delivering ads to a specific demographic targeted by the client. The company proceeds to run ads on those websites to get impressions. However, CW 3 said that Undertone "didn't actually change the site list" that came with the "programmatic supplier" being used by Undertone at the time, which was Google's DV 360 (also known as Google Display & Video 360). Instead, Undertone was "just running the impressions on whatever sites were available," including on many sites that "weren't actual respected websites." CW 3 emphasized that Undertone was "not doing targeting at all" and was "lying about it" to their clients. The witness further explained that many of the sites being used by Undertone had domains of .net and .co and were sites that users would land on "through spam." CW 3 said that the clients did not know of Undertone's practices, which were inconsistent with CW 3's experience in the

industry. When CW 3 questioned these practices, they were told to "just do it this way."

166.    This witness also said that Undertone told customers that it was able to target specific types of users that it was actually not able to target. For example, Undertone was promoting that they could "layer on audiences" to be able to target users under 13 years old when that was "not possible." CW 3 said this was only one example of Undertone "making things up as they go," which seemed to occur on a daily basis there. As a result of these knowingly improper practices, many of Undertone's campaigns were under-delivering, which prompted Undertone to issue "make goods" of "free impressions" in order to retain clients.

167.    CW 3 explained that "allowing campaigns to under-deliver because you're not targeting them properly, with the understanding that you will offer make goods to the advertising company so you can keep [them] as a client" is just one of several Undertone practices (described above) that violated the standards set by the Interactive Advertising Bureau ("IAB"), the body responsible for creating industry standards and guidelines. CW 3 also noted that Undertone's practice of "not providing accuracy in impressions delivered or purchased" also violated IAB's standards. Generally, Undertone did not really comply with IAB standards, which CW 3 "struggled" with, stating that its approach was to try "whatever you can do at this moment."

168.    CW 3 explained that Undertone was able to get away with these improper practices because of its rapid turnover, which included "laying off teams and rehiring" repeatedly.

### d)    CW 4

169.    Confidential Witness 4 (CW 4) is a former Perion employee that worked as a Senior Media Buyer – Data Analyst from January 2020 to August 2022, in the Content IQ division. CW 4's job involved analyzing data from ads as part of the content marketing portion of the Company's business.

170.    CW 4 stated that Content IQ's business was "clickbait" and described its content as "low-brow ads." The witness added that Content IQ owned and operated made for advertising sites that nobody was visiting organically. In fact, "99.9%" of the viewership of these MFA sites were "paid traffic," which CW 4 knew from looking at Content IQ's Google Analytics data.

171.    CW 4 confirmed that Content IQ ran "owned and operated" sites. CW 4 explained that a Content IQ developer would create these "owned and operated" MFA sites and Content IQ content writers would then write material to be published on these sites. Perion's ad operations team handled the site's advertising, which involved media buyers placing ads that led to the site. The goal of Content IQ was to generate clicks and "get as many views as possible."

### e)    CW 5

172.    Confidential Witness 5 (CW 5) was an Associate Sales Director for Perion's Undertone division from September 2021 to January 2024. CW 5 reported to various supervisors during his or her tenure, including the Regional Vice President of Sales, Southeast and Mid-Atlantic; the Senior Director of Sales, Southeast; and the Chief Revenue Officer.

173.    CW 5 was hired as part of a sales team to cover the Washington, D.C. area, including business in Maryland and Virginia, and occasionally in West Virginia or Delaware. The witness sold Undertone's ad services primarily to advertising agencies, but also to clients directly.

174.    CW 5 left Undertone in January 2024 in part because they were hired to "restart a territory that had been neglected," but Perion set revenue expectations that were "outlandish." The witness stated that "as a sales person, that was just frustrating." Perion was not supporting CW 5 or "going to bat for us," to give their team the support they needed, especially given the "really high" sales goals. CW 5 explained that there was "pressure" to "bring in money but no support."

175.    CW 5 explained that "there were talks" about Undertone "overlapping with"

Perion-owned Vidazoo. It appeared Vidazoo offered "a bunch of remnant inventory," typically involving a "sketchy website," that was "super cheap" or "in some cases free inventory." Additionally, Vidazoo offered made-for-advertising (MFA) inventory, which was a "pretty big part" of Vidazoo's business. CW 5 "didn't want to bring up" with his or her clients that Undertone and Perion were working with MFA inventory, which CW 5 described as "just trying to sell as many impressions and scale as possible." CW 5 said that mentioning the MFA component of Undertone and Perion's business to clients would hurt its credibility.

176.    CW 5 left Undertone, in part, due to Perion setting revenue expectations that were "outlandish." CW 5 explained that they were hired to "restart a territory that had been neglected" and that "no one in the region had heard of [Undertone] before." Despite that, Perion set "outlandish" and "really high" sales goals for CW 5's team and had all eyes on them with "pressure [to] bring in money but no support or help." CW 5 grew frustrated by the unrealistic expectations and lack of support offered by Perion.

177.    CW 5 added that he or she remains in contact with current Undertone employees who recently told CW 5 that there are "some serious issues" with Perion's declining stock.

## F.    The Individual Defendants Profited From Their Fraud

178.    The Individual Defendants profited immensely from their fraud. While they were not required to disclose all of their individual sales of stock because Perion is not incorporated in the United States, they disclosed a more limited set of their stock sales under SEC Rule 144.[28]

---

[28] Rule 144 applies specifically to sales of restricted or control securities under certain conditions. The Individual Defendants therefore may have conducted additional Class Period sales that did not fall under Rule 144. The aggregate information described later in this section confirms that they did. Moreover, even these Form 144s show that Defendants Sigron and Gerstel were, at the very least, not careful about disclosing all of their stock sales, because Sigron amended his initial filing and Gerstel did not file a Form 144 for his transaction on May 1, 2023.

179.    Defendants Sigron and Gerstel sold at least the following Perion securities, as shown in their Forms 144 filed during the Class Period:

| Defendant | Date of sale | Number of shares sold | Sale Proceeds | Average sale price |
|---|---|---|---|---|
| Sigron | May 4, 2023 | 2,220 | $73,673.81 | $33.19[29] |
| Sigron | May 15, 2023 | 5,000 | $164,797.50 | $32.96 |
| Sigron | May 16, 2023 | 30,000 | $985,693 | $32.86 |
| Sigron | May 18, 2023 | 59,029 | $1,845,246.54 | $31.26 |
| Gerstel | May 1, 2023 | 41,670 | $1,483,160.71 | $35.59[30] |
| Gerstel | August 1, 2023 | 41,670 | $1,482,894 | $35.59 |
| Gerstel | November 1, 2023 | 41,670 | $1,130,136.24 | $27.12 |
| Gerstel | February 1, 2024 | 41,670 | $1,227,181.50 | $29.45 |

180.    Defendants Sigron and Gerstel thus sold approximately $8.4 million worth of Perion shares (approximately $3.1 million for Sigron and $5.3 million for Gerstel) within the year before Perion's share price collapsed at the end of the Class Period, at prices that were ***multiple times*** Perion's share price after the corrective disclosures. In contrast, neither they nor any other Defendant disclosed any such sales before or earlier in the Class Period. Sigron's last three sales, for approximately $3 million worth of Perion securities, were not conducted pursuant to a trading plan. While Sigron's and Gerstel's other sales were described on their Form 144s as having been made pursuant to a 10b5-1 trading plan, that does not insulate them because those plans were

---

[29] Sigron initially filed a Form 144 disclosing the sale of 100,832 shares on May 4, 2023, for $3,421,229.76. He then amended the form on May 8, 2023 to disclose the smaller transaction noted above, without explaining whether he also made the larger sales disclosed previously outside the scope of this Form 144.
[30] Gerstel did not file a Form 144 for this transaction, but it is disclosed as a prior transaction on the subsequent Form 144 that he filed.

adopted once the fraud was already underway—on November 24, 2022 for Sigron and on February 14, 2023 for Gerstel—and arranged for sales late in the Class Period within six months of these plans.

181.    In addition, Perion's SEC filings show that the Individual Defendants collectively sold nearly all of their shares during the Class Period. Perion's 2020 Annual Report disclosed that the Company's 10 directors and executive officers (which included all of the Individual Defendants) collectively owned 2,014,959 shares of Perion stock as of March 14, 2021, including equity awards (restricted share units ("RSUs") and options to purchase shares) that would vest within 60 days. This amounted to 5.95% of Perion's outstanding shares. By the time Perion filed its 2023 Annual Report, the Company's 10 directors and executive officers collectively owned just 368,279 shares of Perion stock as of March 27, 2024, including equity awards that would vest within 60 days. This amounted to just 0.76% of Perion's outstanding shares.

182.    The following table shows the change in share ownership during the Class Period:

| Date | Shares Beneficially Owned | Percent of Outstanding Shares | Share price range |
|------|---------------------------|-------------------------------|-------------------|
| March 14, 2021 | 2,014,959 | 5.95% | $17.10 to $25.69 (February 9, 2021 – March 14, 2021) |
| March 5, 2022 | 1,233,406 | 2.78% | $12.24 to $30.00 (January 2021 to March 2022) |
| March 6, 2023 | 457,685 | 0.98% | $17.15 to $35.76 (January 1, 2022 to March 6, 2023) |
| March 27, 2024 | 368,279 | 0.76% | $21.58 to $41.85 (January 1, 2023, and March 27, 2024) |

183.    This decline by over 1.64 million shares owned is far more than the 322,091 shares that Sigron and Gerstel disclosed having sold in their Forms 144. The Individual Defendants thus sold even more shares—which encompassed nearly all of their Perion securities—during the Class

Period, before the true nature of Perion's business began to be revealed on April 8, 2024. The range of Perion's share price each year shows that all of these sales took place at prices significantly higher than the $8.61 per share that Perion's stock traded at following the disclosure on June 10, 2024, related to Microsoft cutting ties with Perion's publishers.

184.    Moreover, the Individual Defendants sold even more than these figures show because these figures do not account for shares that they received from equity awards that vested after the cutoff for counting them in the Company's Annual Reports.

185.    The Individual Defendants received substantial equity awards during the Class Period that they sold based on the figures described above. Perion disclosed equity awards to specific individuals only for its CEO. It thus disclosed that Defendant Gerstel was granted 500,000 RSUs that vested over a three-year period commenced on February 1, 2021; performance based options to purchase 225,000 ordinary shares in connection with the renewal of the strategic partnership agreement with Microsoft Bing in November 2020 that vested within two years of that renewal, subject to certain KPI's (*i.e.*, performance milestones); and 150,000 RSUs granted on June 30, 2022 that vested over a three-year period commencing as of April 1, 2022 and 150,000 PSUs granted that same date that vested based on certain financial performance milestones.[31]

186.    Defendant Jacobson was granted 90,000 RSUs and 90,000 PSUs as of February 7, 2023, that vested over three years, with one-third vesting on February 7, 2024. Perion did not disclose Jacobson's equity awards prior to his being appointed CEO other than as they were included in the overall compensation figures that the Company disclosed.

187.    Perion also disclosed the Individual Defendants' overall compensation during the Class Period, a significant portion of which was equity-based compensation or was otherwise

---

[31] Perion's RSUs are restricted shares of Perion stock that would vest over a three-year period. Its PSUs are performance-based share units that linked to certain financial performance goals.

based on the Company's financial performance. The total compensation for the CEO (Gerstel and then Jacobson) was at least $2.8 million each year and the total compensation for the other Individual Defendants (Sigron and Jacobson) was at least $1.3 million each year.[32] Moreover, the equity-based compensation that that the Individual Defendants received was actually higher than what was disclosed because it was based on the value of the Company's shares "on the RSU grant date" and "does not necessarily reflect the cash proceeds to be received by the applicable officer upon the vesting and sale of the underlying shares," which would be substantially higher if the Company's shares were worth more when they were sold. That was the case here because the options were priced based on the recent trading price as of the grant date and, as shown by the range of Perion's share price during the Class Period noted above, Perion's stock price consistently increased as a result of the false and misleading statements at issue in this case.

188.     In 2021, the Individual Defendants received the following compensation (in thousands of dollars):

| Name and Principal Position [1] | Salary Cost [2] | Bonus [3] | Equity-Based Compensation [4] | Total |
|---|---|---|---|---|
| Doron Gerstel, Chief Executive Officer | 634 | 1,254 | 946 | 2,834 |
| Maoz Sigron, Chief Financial Officer | 343 | 535 | 514 | 1,392 |
| Daniel E. Aks, President, Undertone Business Unit | 540 | 600 | 202 | 1,342 |
| Tal Jacobson, General Manager, CodeFuel Business Unit | 387 | 677 | 260 | 1,324 |

189.     In 2022, the Individual Defendants received the following compensation (in thousands of dollars):

---

[32] This compensation "includes bonuses paid to [Perion's] officers pursuant to our executive bonus plan based on company performance measures." Similarly, the CEO's (Gerstel and then Jacobson) bonus was "up to 100% of his annual base salary, or 150% in case of overachievement, based on a performance matrix." The CEO's "bonus also includes a discretionary component, not based on measurable performance indexes. In addition, [Perion's] Compensation Committee and the board of directors shall be authorized to grant [the CEO], from time to time, a special bonus as set out in, and subject to the terms of, our Compensation Policy." This language describing the CEO's bonus is from the Company's 2023 Annual Report. The 2021 and 2022 Annual Reports contain substantially similar language, noting that the discretionary component of the bonus was up to 25% of the total bonus.

| Name and Principal Position [1] | Salary Cost [2] | Bonus [3] | Equity-Based Compensation [4] | Total |
|---|---|---|---|---|
| Doron Gerstel, Chief Executive Officer | 755 | 1,312 | 1,711 | 3,778 |
| Tal Jacobson, General Manager, CodeFuel Business Unit | 455 | 826 | 549 | 1,830 |
| Maoz Sigron, Chief Financial Officer | 368 | 560 | 837 | 1,765 |
| Daniel E. Aks, President, Undertone Business Unit | 540 | 625 | 459 | 1,624 |
| Gal Dagan, Co-Founder and VP R&D, Vidazoo Business Unit | 486 | 273 | 675 | 1,435 |

190.    In 2023, the Individual Defendants received the following compensation (in thousands of dollars):

| Name and Principal Position [1] | Salary Cost [2] | Bonus [3] | Equity-Based Compensation [4] | Total |
|---|---|---|---|---|
| Tal Jacobson, Chief Executive Officer | 651 | 853 | 1,916 | 3,420 |
| Doron Gerstel, Former Chief Executive Officer | 166 | 822 | 1,577 | 2,565 |
| Maoz Sigron, Chief Financial Officer | 416 | 616 | 691 | 1,723 |
| Daniel E. Aks, President, Undertone Business Unit | 585 | 228 | 546 | 1,359 |
| Gal Dagan, Co-Founder and Former VP R&D, Vidazoo Business Unit | 303 | - | 675 | 978 |

191.    In sum, each of the Individual Defendants sold substantial amounts of their Perion shares over the course of the Class Period, at artificially inflated prices, before the fraud was revealed. They also each received millions of dollars in compensation, substantial portions of which were tied to Perion's financial performance. They were therefore incentivized to perpetuate their misstatements about Perion's business while they continued to receive inordinately high compensation tied to Perion's inflated stock price and its unsustainable financial performance.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

192.    Throughout the Class Period, Defendants made materially false and misleading statements regarding Perion's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (a) Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic and (b) Perion's Content IQ division dealt primarily with made-for-advertising (also known as clickbait) websites (which were included in Perion's search traffic under its Microsoft agreement), including Perion's owned and operated sites and those that the Company ran for its third-party

58

publishers.[33]

**A.**    **Defendants' Materially False and Misleading Statements From 2021**

193.    The Class Period begins on February 9, 2021, the day Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing the Company's financial results for the fourth quarter and full year 2020.  This press release quoted Defendant Gerstel as saying that "[d]uring the fourth quarter, we renewed and expanded our strategic partnership with Microsoft Bing for an additional four years." When comparing 2020 to 2019, this press release stated that "Search Advertising and other revenues increased by 3% *due to a higher number of daily searches*."

194.    The foregoing statements in ¶ 193 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

195.    Also on February 9, 2021, Perion held an earnings call with analysts and investors in conjunction with its financial results for the fourth quarter and full year 2020, on which Gerstel and Sigron spoke. As part of his opening remarks, Gerstel promoted the renewal of the Microsoft agreement as "a result of the strong and healthy partnership we have cultivated with Microsoft advertising over the last 10 years. The continuing collaboration between our companies will enable [Perion] to further grow its network of publishers, offering lucrative search technology solution[s] and [a] sophisticated experience for monetizing their digital property. We estimate that the revenue contribution in the next 4 years under the new agreement with Bing[] will be $800 million."

---

[33] Where statements in this section are ***bolded and italicized***, those portions are alleged to be false and misleading. Where a paragraph does not have such emphasis added, the entire statement is alleged to be false and misleading.

196.    Also on this earnings call, as part of his opening remarks, Sigron said that revenues increased for the full year 2020 due to the "higher number of daily search[es]." Sigron added, "[t]he renewed contract with Microsoft Bing for [an] additional 4 years will continue to help us to increase the activity with existing and new publishers." When responding to an analyst question regarding the nature of Perion's renewed contract with Microsoft, Gerstel promoted the strength of their relationship, including that Perion received favorable terms on the new agreement because it was "part of a very few vendors that being able to really engage for such a long period of time," including "I think the main important factor that has to do with better rev share, that's one. . . . So we are going to get more margin from Microsoft." Gerstel also promoted the Company's "estimate that in the course of the next 4 years, we [are] able to generate $800 million from this agreement, and $200 million in average on annual revenue. Currently, we're in the level of about $172 million. So that's definitely a significant increase. And what I am more happy with is the fact that it's a sustainable, predictable stream of revenue that has to do with this pillar, search advertising. . . . It's definitely moving in just the right direction and it is generating for us a substantial revenue."

197.    The foregoing statements in ¶¶ 195-96 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

198.    Also on the February 9, 2021 earnings call, Defendant Gerstel emphasized the ability of websites from Content IQ's business to contribute to Perion's Search business. As part of his opening remarks, he explained that Perion's "content monetization engine" "is working so well for our own[ed] and operated site, which brought first-tier publishers such as Newsweek, Entrepreneur magazine[] and the Bonnier group of clients, and it's just the beginning as the new

growing number of publishers we can support via our content monetization platform allow us to establish our own strategically controlled [walled] garden. This is an efficient way and scalable way to generate first-party data and drive revenue in a cookie-less world."

199.    Then, when responding to an analyst question regarding Content IQ's purported success and the synergy it offers, Gerstel explained that adding websites from Content IQ allowed Perion to reduce its traffic acquisition costs ("TAC") by having Search traffic come from these "in-house" sources rather than having to pay third parties for that traffic. He stated that these businesses were expanding "their content optimization platform to other first tier publisher[s]. I mentioned Newsweek I mentioned Entrepreneur and Bonnier are just the first one." Gerstel emphasized that these websites "supply of course the demand that can be generated from our partnership with Microsoft Bing." He added that these publishers thus allowed Perion to increase both its "demand capability" and its "supply capability," giving it a "great opportunity to definitely reduce our TAC and which will increase our margin." Gerstel also made clear on this call that adding these purportedly "first-tier" websites to Perion's network "created a great, large supply," that "definitely can be a great opportunity for other business unit[s] that generate demand."

200.    The foregoing statements in ¶¶ 198-99 were materially false and misleading for the reasons stated in ¶ 192(b) above related to Perion's Content IQ division, including because Newsweek and Entrepreneur have been specifically identified as made-for-advertising websites.

201.    On March 8, 2021, Perion held an Investor and Analyst Day, on which, among others, Defendants Gerstel, Sigron, Jacobson, and Katzir spoke. As part of his prepared remarks, Defendant Gerstel said, "[s]o what are the key growth drivers? First, has to do very much [with] the Microsoft Bing partnership." He explained that the renewal of the Microsoft agreement "was very important for all of our advertising, search monetization partners." He explained that based

on these relationships, Perion's "forecast is calling for an $800 million of revenue in the next four years of this partnership."

202.    Similarly, as part of his prepared remarks at Perion's March 8, 2021 Investor and Analyst Day, Defendant Jacobson said that "[w]e've signed a strategic agreement with Microsoft, which we'll talk about in a minute. And we're working with different search providers to help us gain more and more markets worldwide. And we also work on different new technologies and products hand-in-hand with Microsoft and I'm happy to say that we're seeing some very positive signals from those products."  He also repeated that "we estimate that the value of this [renewal of the Microsoft] agreement will generate about $800 million."

203.    When discussing Perion's Search business, Gerstel said "that in the first quarter of 2021, and we'll report it on our earning call at the end of April, where we're able to see more than 20 million searches a day, highest record than ever that we've seen before. ***And this is very much a result of more online shopping and a great place to increase the search advertising spend.***"

204.    The foregoing statements in ¶¶ 201-03 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

205.    Also, at the March 8, 2021 Investor and Analyst Day, Defendant Katzir said, "I'd like to share with you what we've built here at Content IQ which is the modern infrastructure for operating a digital publishing business in a profitable way.  What we've taken as the four pillars of digital publishing which is distribution or user acquisition, the websites and infrastructure revenues, which is the monetization aspect and of course the Content itself, and we've applied data and analytics tools to each of these aspects. Taking Newsweek as an example, our mission is to

increase the value from each user visit to the website, which were referred to as a session defined as the length of time the user spends on the new Newsweek website and the revenues that Newsweek is able to generate from the session. . . . Overall, the results of these four systems working together enable publishers to succeed in this challenging digital world by maximizing the revenue for user sessions."

206.    The foregoing statements in ¶ 205 were materially false and misleading for the reasons stated in ¶ 192(b) above related to Perion's Content IQ division, including because Newsweek has been specifically identified as made-for-advertising websites.

207.    On March 25, 2021, Perion filed an Annual Report on Form 20-F with the SEC, reporting on the Company's financial and operating results for the year ended December 31, 2020 (the "2020 20-F"). Defendants Gerstel and Sigron signed the 2020 20-F and signed certifications pursuant to the Sarbanes-Oxley Act of 2002, as the Principal Executive Officers of the Company, attesting to the accuracy of the statements in the 2020 20-F.

208.    The 2020 20-F stated the following regarding risks associated with Perion's agreement with Microsoft:

> **Our search solution depends heavily upon revenues generated from our agreement with Microsoft, and any adverse change in that agreement could adversely affect our business, financial condition and results of operations.** . . .
>
> If our Microsoft Agreement is terminated or substantially amended (not on favorable terms), we would experience a material decrease in our search-generated revenues or the profits it generates and would be forced to seek alternative search providers, at less competitive terms or accelerate the business we have with such search providers.

209.    The foregoing statements in ¶¶ 207-08 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that

dealt in fake or not monetizable traffic, which presented a significant risk that Microsoft would reduce its relationship with Perion and the Company's publishers.

210.    The 2020 20-F stated the following regarding risks associated with Perion's methods used for the distribution of its search solution:

> **Should the methods used for the distribution of our search solution, be blocked, constrained, limited, materially changed, based on a change of guidelines, technology or otherwise (as has happened in the past), or made redundant by any of our search engine providers, our ability to generate revenues from our users' search activity could be significantly reduced.**
>
> ***Agreements with search providers, such as our agreement with Microsoft, require compliance with certain guidelines promulgated by them for the use of the respective brands and services***, including the manner in which paid listings are displayed within search results, and ***the establishment of guidelines to govern certain activities of third parties to whom the search services are syndicated, including the manner in which those parties can acquire new users and drive search traffic***. Subject to certain limitations, search partners may unilaterally update their policies and guidelines, which could, in turn, require modifications to, or prohibit and/or render obsolete certain of our search solutions, products, services and practices, which could be costly to address or otherwise have an adverse effect on our business, our financial condition and results of operations. ***Noncompliance with the search partners' guidelines, whether by us or by third parties to which we syndicate paid listings or by the publishers through whom we secure distribution arrangements could, if not cured, result in such companies' suspension of some or all of their services to us, or to the websites of our third party publishers, or the reimbursement of funds paid to us, or the imposition of additional restrictions on our ability to syndicate paid listings or distribute our search solution or the termination of the search distribution agreement by our search partners***.
>
> These guidelines, with respect to method of distribution, homepage resets and default search resets to search engine services, were changed by both Microsoft and Google numerous times in the past, having negative revenue implications. Since then, both companies have continued instituting other changes to the policies governing their relationship with search partners. ***Should any of our large partnerships be deemed non-compliant, blocked*** or partner with another provider, it could be difficult to replace the revenues generated by that partnership and we would experience a material reduction in our revenues and, in turn, our business, financial condition and results of operations would be adversely affected.

211.    The foregoing statements in ¶ 210 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic, which presented a significant risk that Microsoft would reduce its relationship with Perion and the Company's publishers.

212.    When discussing "Growth Through Search Monetization," the 2020 20-F said, "[o]ur search monetization solution, leverages our relationship with Microsoft Bing and other leading search and content partners, to drive innovation and revenue based on AI and analytic tools as part of our ongoing effort to provide comprehensive and compelling search solutions and monetization tools to diversified publishers around the globe. We do this through a variety of digital properties, including websites, apps, extensions, and search engines."

213.    When describing "Search," the 2020 20-F said, "Our search-related products address the market by engaging with premium search providers like Microsoft, and offers end users the ability to search the Internet via easily embedded search functionality in different search assets. . . . The factors that drive the ability of our search engine partners to increase their revenue per search, include the availability of search advertising inventory relative to demand, as well as internal pricing dynamics."

214.    The 2020 20-F also stated, when discussing revenues in 2020 as compared to 2019, that "Search Advertising and other revenues increased by 3% in 2020, from $173.6 million in 2019 to $179.4 million in 2020. This increase is due to [a] higher number of daily searches partially offset by lower RPMs."

215.    The foregoing statements in ¶¶ 212-14 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant

part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

216.    The 2020 20-F also said, when discussing Trend Information, that "[t]hrough Content IQ, we provide advertisers the ability to serve advertisements which are targeted to the end-user's interests alongside relevant optimized content and page-level reader engagement."

217.    The 2020 20-F also said, "[i]n 2020, revenues increased by 25% compared to 2019, primarily due to 69% growth in Display and Social Advertising primarily resulting from the acceleration of our Connected TV advertising offering and the contribution of our content monetization platform evolving from the acquisition of Content IQ and Pub Ocean."

218.    The foregoing statements in ¶¶ 216-17 were materially false and misleading for the reasons stated in ¶ 192(b) above related to Perion's Content IQ division.

219.    On May 4, 2021, Perion filed with the SEC a Form 6-K, signed by Sigron that attached a press release issued the same day, announcing Perion's financial results for the first quarter of 2021. When comparing the first quarter of 2021 to the same quarter of 2020, the press release states that "Search Advertising and other revenues increased by 22%, *primarily due to a record 17.7 million of average daily monetizable search queries we delivered to Microsoft Bing compared to 12.2 million in the first quarter of 2020 and increased number of new publishers*."

220.    The foregoing statements in ¶ 219 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

221.    On May 4, 2021, Perion also held an earnings call with analysts and investors in conjunction with its financial results for the first quarter of 2021, on which Defendants Gerstel and

Sigron spoke.  As part of his opening remarks, when discussing how Perion generates revenue "from both[] the demand and supply side," Defendant Gerstel said, "[a]nd we are also a publisher site platform that brings first and third parties a content monetization system for owned and operated assets as well as sites such as Newsweek and Entrepreneur and other prominent website[s]. We also developed a solution and innovative products that connect publisher[s] with the leading search engine like Bing, delivering high-quality leads." He continued later in the call, "since we are very much defining the content for those that are reading the content, either on our own and operated sites or sites that we operate, like Newsweek and Entrepreneur, we are targeting our search unit for those readers that are in exploring stage."

222.    Also on this earnings call, as part of his opening remarks, Defendant Sigron said that "[s]ales advertising and other revenue increased by 22% as a result of a higher number of daily monetizable search queries we delivered to Microsoft Bing and others."

223.    The foregoing statements in ¶¶ 221-22 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic, as well as for the reasons stated in ¶ 192(b) above related to Perion's Content IQ division (including because Newsweek and Entrepreneur have been specifically identified as made-for-advertising websites).

224.    On June 8, 2021, Defendant Gerstel spoke at the Stifel Cross Sector Insight Conference. During his opening remarks, Gerstel said about "[o]ur very important partnership that we announced on November 2020 was with Microsoft Bing," that "our forecast for the four year of the agreement between 2021 to 2024 is to generate $900 million of revenue. We are very proud [of] this agreement, not just because it's four years, quite rare for Microsoft … four years

agreement, but we got an improved -- they expand our reach from 6 countries on the previous agreement to 34 countries then we are getting some new product and that's why it allows us to be . . . very much bullish about this agreement that will generate significant amount of dollars."

225.    The foregoing statements in ¶ 224 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

226.    On August 3, 2021, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing the Company's financial results for the second quarter of 2021.  The press release lists "[s]earch advertising revenue growth of 24%, primarily driven by increased performance advertising spend by brands" as one of Perion's second quarter 2021 highlights.  Additionally, when comparing the second quarter of 2021 to the same quarter of 2020, the press release states that "[s]earch and other revenues increased by 24%, primarily due to 16.9 million of average daily monetizable search queries compared to 13.0 million in the second quarter of 2020, as well as the addition of 28 publishers to our network."

227.    The foregoing statements in ¶ 226 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

228.    Also on August 3, 2021, Perion published an Investor Presentation in conjunction with its financial results for the second quarter of 2021 listing Defendants Gerstel and Sigron on its "Introduction" slide as the Company's CEO and CFO (respectively). The presentation promoted to investors that Perion's "content monetization solution" was a tool for digital magazines and

newspapers that were struggling with declining advertising on their websites:



229.    The foregoing statements in ¶ 228 were materially false and misleading for the reasons stated in ¶ 192(b) above related to Perion's Content IQ division, including because Newsweek has been specifically identified as a made-for-advertising website.

230.    On August 3, 2021, Perion also held an earnings call with analysts and investors in conjunction with its financial results for the second quarter of 2021, on which Defendants Gerstel and Sigron spoke. As part of his opening remarks, Defendant Sigron said, "[s]ales advertising and other revenue increased by 24% resulting from a higher number of daily monetizable search queries we delivered to Microsoft Bing and others."

231.    Then on August 31, 2021, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, containing management's discussion and analysis of financial condition and results of operation as of June 30, 2021.  The press release states that "Search Advertising and other revenues increased by 23%, from $84.0 million in the six-month period ended June 30, 2020 to $103.3 million in the six-month period

ended June 30, 2021. This increase is mainly due to higher average daily monetizable search queries in 2021, as well as an increased number of new publishers."

232.    The foregoing statements in ¶ 230-31 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

233.    On October 26, 2021, Perion held an earnings call with analysts and investors in conjunction with its financial results for the third quarter of 2021, on which Defendants Gerstel and Sigron spoke.  As part of his opening remarks, Defendant Sigron said, "[s]ales and advertising revenues increased by 14%, mainly as a result of higher number of daily monetizable searches, queries were delivered to Microsoft Bing and others. Our average daily number of searches was 14.7 million compared to 12.8 million last year. We added 17 new publishers to our network."

234.    The foregoing statements in ¶ 233 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

235.    On December 6, 2021, Defendant Gerstel spoke at the Raymond James Technology Investors Conference. When responding to an analyst question about Perion's evolution, Defendant Gerstel said "[t]he demand side is connected into our customer brand agency, Microsoft Bing is definitely one of them and that's the important. The right side is connected into [a] publisher. It can be [a] publisher or it can Facebook and it can be others, those are the publisher[s] that we have here. And a very, very important piece, which is here, it's a critical intersection between the demand and supply, and that's the Intelligent Hub. So every, every impression, every

70

request that we have is going through the Intelligent Hub. So you get here, an interesting idea what is going into this intersection as very important piece, huge technology investment from our side, 17 million searches a day going into this piece, 200,000 daily user sessions, 3 billion daily ad request[s], 60 million monthly engagement ads… So think about this, the best way maybe a meat grinder that [is] able to take all this information and do what with it."

236.    Additionally, when responding to an analyst question regarding what the key has been for Perion increasing its relationship with Microsoft Bing, Defendant Gerstel said, "Due to the fact that we are doing better, this whole rev share is a tier based rev share. So we are able to get improved revenue share and they roll out new products through Perion. The overall forecast, as we can see it right now between 2021 and 2024, is around $900 million revenue in the course of four years for Perion."

237.    The foregoing statements in ¶¶ 235-36 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic, as well as for the reasons stated in ¶ 192(b) above related to Perion's Content IQ division.

**B.    Defendants' Materially False and Misleading Statements From 2022**

238.    On February 9, 2022, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing the Company's financial results for the fourth quarter and full year 2021.  This press release quoted Defendant Gerstel as saying that "our expanded relationship with Microsoft Bing drove a 19% increase in search advertising revenue and significant incremental EBITDA." The press release lists "Search Advertising revenue growth of 16%, primarily driven by an increased number of commercial searches, as well as a higher percentage of transactional searches" as one of Perion's fourth quarter

71

2021 highlights. It also stated that this increase "was achieved primarily due to 17.5 million average daily commercial search queries compared to 15.7 million in the fourth quarter of 2020 and 43% year-over-year increase in the number of publishers in our network."  Similarly, when comparing 2021 to 2020, this press release states that "Search Advertising increased by 19% and represented 45% of total revenue compared to 55% in 2020. The increase was achieved primarily due to 16.7 million of average daily commercial search queries compared to 13.4 million in 2020 and a 37% year-over-year increase in the number of publishers in our network."

239.    The foregoing statements in ¶ 238 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

240.    On February 9, 2022, Perion published a presentation in conjunction with its financial results for the fourth quarter and full year 2021 titled "Fourth Quarter and Annual 2021 Earnings Conference Call" listing Defendants Gerstel and Sigron on its "Introduction" slide as the Company's CEO and CFO, respectively. This presentation contained the slide discussed in ¶ 42 above describing Perion's iHub.

241.    The foregoing statements in ¶ 240 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic, as well as for the reasons stated in ¶ 192(b) above related to Perion's Content IQ division (including because Newsweek and Entrepreneur have been specifically identified as made-for-advertising websites).

242.    On February 9, 2022, Perion also held an earnings call with analysts and investors

72

in conjunction with its financial results for the fourth quarter and full year 2021, on which Gerstel and Sigron spoke. As part of his opening remarks, Gerstel said, "[s]earch is still growing. We increased the number of publishers to 114 from 79. . . . And of course, the fact that we added more publishers, I put here a slide that compared the number of monetized searches, monetized searches is only searches that we are getting a rev share on, and I tried to compare it between 2019, 2020 and 2021." Gerstel continued by stating that "I think that we definitely understand the advantage of searching before buying, no matter if this will be done [] online or not online. Keep in mind that we are getting rev share on searches, not on the actual purchase itself. So monetized searches will never go back, it's just going to increase. And we are very happy to see it because it has a direct impact on the fact that we're able to grow our search business by 16% on year-over-year."

243.    The foregoing statements in ¶ 242 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

244.    On February 10, 2022, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing that Perion's search advertising business won Microsoft Advertising's Supply Partner of the Year Award.  When describing Microsoft Advertising's Supply Partner of the Year Award, this press release states that "[t]his prestigious award goes to the business that has shown excellence in partnership with Microsoft Advertising across all areas of collaboration." This press release quoted Defendant Gerstel as saying that "[w]ith a partnership with Microsoft that is more than a decade old, the recognition of being named Microsoft's Advertising Partner of the Year is the culmination of our work together thus far, and we believe it is just the beginning…. The pandemic saw an

unprecedented explosion in the eCommerce sector, the equivalent of years of growth…. As a result, advertisers allocated more of their budget to the search category, where consumers express their highest level of purchase intent, which makes our partnership with Microsoft Advertising even more strategic. Together, we remain committed to building our publisher network while maintaining the impeccable quality standards which matter so much to both of us."

245.    Additionally, this press release quoted Defendant Jacobson as saying that "[t]he award theme 'Together we are limitless' truly reflects the spirit of how we worked together with Microsoft Advertising to achieve fantastic growth results year over year. We accomplished this through ongoing technology investments and a relentless focus on quality. The close collaboration between the teams has enabled us to introduce new features in our search technology suite and expand our network of publishers globally."

246.    The foregoing statements in ¶¶ 244-45 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

247.    On March 16, 2022, Perion filed an Annual Report on Form 20-F with the SEC, reporting on the Company's financial and operating results for the year ended December 31, 2021 (the "2021 20-F"). Defendants Gerstel and Sigron signed the 2021 20-F and signed the certifications pursuant to the Sarbanes-Oxley Act of 2002, as Perion's Principal Executive Officers, attesting to the accuracy of the statements therein.

248.    The 2021 20-F contained language that is substantially similar to the language in the 2020 20-F referenced above. (*See supra* ¶¶ 208, 210, 212-13, 216).

249.    The foregoing statements in ¶ 248 were materially false and misleading for the same

reasons as the substantially similar language in the 2020 20-F. (*See supra* ¶¶ 209, 211, 215, 218).

250.    The 2021 20-F also stated that "[i]n February 2022 we were named Microsoft Advertising's 2021 Supply Partner of the Year EMEA. This prestigious award goes to the business that has shown excellence in partnership with Microsoft Advertising across all areas of collaboration. This recognition is based on key partnership results that include engagement, revenue growth, feature adoption in Search and Native, and the scale of joint activities."

251.    Additionally, the 2021 20-F said, "Search Advertising revenue increased by 19% in 2021, from $179.4 million in 2020 to $213.2 million in 2021. This increase is result of higher numbers of daily monetizable searches that were delivered to Microsoft Bing and others as well as increased numbers of publishers."

252.    The foregoing statements in ¶¶ 250-51 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

253.    On April 28, 2022, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing that Perion's search advertising business won Microsoft Advertising's Global Supply Partner of the Year. This press release quoted Defendant Gerstel as saying that "[w]e've had a partnership with Microsoft that extends more than ten years, and ***this recognition as Microsoft's Advertising Partner of the Year is a moment of great pride in a long history of successes***. Yet it is only the start… As consumers globally relied on ecommerce to an unprecedented degree - advertisers responded by investing more into search – which is the category where consumers demonstrate the highest degree of intent. ***Capitalizing on this generational shift required close collaboration between the CodeFuel team***

75

***and the Microsoft team, and the results speak for themselves***. Going forward, we will continue to build our network of publishers, ***while maintaining the impeccable quality standards which matter so much to both of us***."

254.    Additionally, this press release quoted Defendant Jacobson as saying that "[t]he growth we have achieved in the last couple of years reflects the close collaboration and the teams' dedication to our mutual success, year after year …. If I could name three main areas of effort that brought us to this point, I would say technology investments, close collaboration with our publishers to fuel growth, and focus on quality to maximize user engagement and brand safety."

255.    The foregoing statements in ¶¶ 253-54 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

256.    On April 28, 2022, Perion published a presentation in conjunction with its financial results for the first quarter of 2022 titled "Q1/2022 Presentation" listing Defendants Gerstel and Sigron as the Company's CEO and CFO (respectively).  This presentation included a slide on "Q1 22 Search Advertising Revenues" which said "18.1 million average daily commercial searches compared to 17.7 last year" and "120 publishers compared to 95 last year," and repeated these figures in the following slide on "Search Advertising Growth":



257.    Also on April 28, 2022, Perion also held an earnings call with analysts and investors in conjunction with its financial results for the first quarter of 2022, on which Defendants Gerstel and Sigron spoke.  As part of his opening remarks, Defendant Gerstel said, "[f]rom a search advertising standpoint, the numbers, we grew our business by 10% between the first quarter of 2021 to the first quarter of 2022. The most important KPIs of this business has to do with the average daily monetize search. Those are the average daily monetized search. We are at 18.1 million daily monetized search and you're able to see that between 2019 and 2020 and 2021, the number decreased significantly which translated into the revenue, as you can see it here. What is behind it? What's behind it is the fact that we're able to increase our number of publishers, 95 publisher in the first quarter of 2021, and now we have 120 publishers."

258.    As part of his opening remarks, Defendant Sigron said, "[s]ales advertising revenue was $56.7 million during the first quarter of 2022, an increase of 10% year-over-year. Growth was achieved primarily due to $18.1 million average daily commercial search compared to $17.7

million in the first quarter of 2021 as well as the addition of 25 new publishers to our network."

259.    Also, on this earnings call, when responding to an analyst question regarding Perion's search growth trends relative to Google and Microsoft, Gerstel said, "[s]o first and foremost, we are not competing with them. We are partnering with them. And basically, we are providing them search feed. In other words, we are working with our partners. ***And we are using a lot of -- in this case, being as a partner, their tools, how to increase the number of quality searches***. And that's very much the idea."

260.    The foregoing statements in ¶¶ 256-59 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

261.    On May 19, 2022, Defendant Gerstel spoke at the 17th Annual Needham Technology & Media Conference. When responding to an analyst question regarding the importance of Perion's iHub, Gerstel stated that "everything that has to do with ad tech business is targeting, because the better way you target your audience, the performance of the campaign and the return on ad spend for your advertiser is up. And the question is and this was the first mission when we were kind of thinking about the hub is, how our ability to very much taking all inten[t] signal that's coming from all parts of the house, demand side, supply side, in this case, for instance, the search type of business." Then, when responding to an analyst question regarding the value that the search business adds to Perion, Gerstel said, "[t]he point here is other than the revenue and the margin, we have 18 million searches a day, that's quite -- I think that like 75% or even 80% were in the U.S. [T]hat's an asset that not many . . . have. . . . But it give[s] us a huge advantage when it comes to targeting. So by all means, we are working really hard to keep this

relationship going. It's very, very strategic for the company. Not just for its revenue, it[] allows us to be very effective on the display advertising."

262.    The foregoing statements in ¶ 261 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

263.    On August 3, 2022, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing the Company's financial results for the second quarter of 2022.  This press release quoted Defendant Gerstel as saying that "[i]n response to the current macro-economic pressure, advertisers are demanding greater performance, and shifting media budgets to direct response. This has driven the RPM (Revenue Per Thousand searches) of our search advertising to an all-time record high."  When comparing the second quarter of 2022 to the same quarter of 2021, the press release states that "[s]earch revenue increased by 26%, accounting for 44% of revenue, primarily due to a 42% increase in average RPM and a 33% increase in number of publishers."

264.    The foregoing statements in ¶ 263 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

265.    Also on August 3, 2022, Perion published a presentation in conjunction with its financial results for the second quarter of 2022 titled "Q2/2022 Presentation," listing Defendants Gerstel and Sigron as the Company's CEO and CFO (respectively).  This presentation also contained the following slide describing Perion's iHub:



266.    The foregoing statements in ¶ 265 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic, as well as for the reasons stated in ¶ 192(b) above related to Perion's Content IQ division (including because Newsweek and Entrepreneur have been specifically identified as made-for-advertising websites).

267.    On August 3, 2022, Perion also held an earnings call with analysts and investors in conjunction with its financial results for the second quarter of 2022, on which Defendants Gerstel and Sigron spoke. Gerstel stated that "we increased the number of publisher[s] to 124 from 93 in [the] last year, and the other thing, based on the intent or the searches that we analyze, we definitely can say that travel is back and it's back in a big way, where more and more consumers are looking for tr[avel] deals, and this gives advertiser a great way to spend more on search

advertising, spend more means, they increase the RPM in order to be higher in the place where consumers are searching for travel deals." Then, when responding to a question regarding Perion growing its search revenue during the second quarter at a higher rate than Google, Gerstel said that "Yeah, so first and foremost, what drives is that we increased substantially the number of new publisher that we are working with, that's number one. So more publisher, more search that we provide to our partner, this is one. The second thing is that we are seeing the increase on the RPM. But let me -- because RPM is definitely something that impact Google and others as well, but we have a very interesting way to direct and guide our publisher to -- because the RPM that we are reporting here is an average and RPM that we're more than others, I mentioned travel, so working with publisher that are able to drive searches in areas where RPM is higher, that's I think our secret sauce."[34]

268.    The foregoing statements in ¶ 267 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

**C.    Defendants' Materially False and Misleading Statements From 2023**

269.    On January 4, 2023, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing its preliminary financial results for the fourth quarter of 2022. This press release quoted Defendant Gerstel as saying that "[w]e are encouraged by our ability to gain market share by significantly increasing the number of publishers adopting our monetization platform to 260, a 25% increase year-over-year."

270.    The foregoing statements in ¶ 269 were materially false and misleading because

---

[34] Gerstel explained earlier in the call that "RPM" refers to the rate per 1000 clicks earned on search advertising.

Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

271.    On February 8, 2023, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing the Company named Tal Jacobson as CEO to succeed Doron Gerstel effective August 1, 2023.  This press release quoted Defendant Gerstel as saying that "Tal has done remarkable work at CodeFuel. He has significantly modernized and enhanced our search advertising platform, driving our revenue growth and cash generation, while forging a strong and collaborative relationship with Microsoft Advertising."

272.    Also on February 8, 2023, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing the Company's financial results for the fourth quarter and full year 2022.  When comparing the fourth quarter of 2022 to the same quarter of 2021, this press release states that "Search Advertising revenue increased by 49% year-over-year, accounting for 41% of revenue, primarily due to a 13% increase in RPM and a 26% increase in average daily searches."  When comparing 2022 to 2021, it states that "Search Advertising revenue increased by 31%, accounting for 44% of revenue, primarily due to a 21% increase in RPM and 11% increase in average daily searches."

273.    On February 8, 2023, Perion published a presentation with its financial results for the fourth quarter and full year 2022 titled "Q4 and FY 2022 Presentation," listing Defendants Gerstel, Sigron, and Jacobson as the Company's CEO, CFO, and General Manager of CodeFuel (respectively).  The presentation included the following slide on "Q4 2022 Search Advertising Revenues" which represented year-over-year growth in search advertising revenue, RPM, the number of publishers, and the number of daily searches:



274.    Also on February 8, 2023, Perion also held an earnings call with analysts and investors in conjunction with its financial results for the fourth quarter and full year 2022, on which Defendants Gerstel, Sigron and Jacobson spoke. As part of his opening remarks, Gerstel said, "[o]ur portfolio and healthy direct response solution via search advertising continues to be one of our most profitable and sustainable exploit solutions. The business is driven by two levers: increasing the number of publishers and aggregate number of monetized number of searches we transfer, mainly to Microsoft Bing. That number is robust and impressive. We are reporting today 22 million average . . . daily search that is going through us in Q4 2022, an increase of 26% year-over-year. . .  Let me quickly point out again that direct response is one of the three pillars of our diversification strategy. As cost sensitive advertisers move to ad search, we are there."

275.    Also during this earnings call, Jacobson said that his task as head of CodeFuel "was to transform the search business, which was in a period of decline, into a sustainable, profitable growing business. By solidifying our key relationship with Microsoft Advertising, investing in technology, and focusing on quality, we achieved just that. Today, our search advertising business

enjoys a robust relationship with Microsoft Advertising. Just one year ago, we were named Microsoft Advertising's Global Supply Partner of the Year. This is aligned with what Perion stands for: an innovator, a leader in technology, and a differentiator in the entire ad tech market."

276. When responding to a question regarding whether there is a risk that Bing can decline to renew its agreement with Perion in the future given Microsoft's adoption of ChatGPT, Defendant Gerstel said, "[a]s far as ChatGPT, and we're having a very close conversation with the guys, I definitely see no risk." He explained that the "only way" for Microsoft to recoup its $10 billion investment into ChatGPT "is that they will increase revenue and they will rely more on partners like CodeFuel to drive more searches, underline quality searches that they're able to monetize and very much generating a healthy business for advertisers."

277. Also, on the February 8, 2023 earnings call, when responding to another analyst question about how Microsoft's use of ChatGPT will benefit Perion, Defendant Gerstel stated:

> Bing's big policy is to rely on a very limited amount of partners which they certify. We are one of them, we're not the only one but it's a handful of partners - that's Bing policy. Now what they ask for each partner is to deal with hundreds of publishers, and the way--and *they're expecting from the partners as well as from us that we will screen all searches and we will deliver only quality searches, because quality means searches with high intent*, otherwise Bing, as you know--Bing is charging the advertiser once they click on an ad on any given search ad page or search results page.
>
> *Now, what is a quality searcher? Quality searcher is the one that clicks and actually has true intent to buy or true intent to visit this website. What is a non-quality is bots and everything here which is not having an intent.* That's why in--what Bing is expecting for us to increase the number of quality searches, and *the way for us to translate it is working with more and more publishers and more and more quality publishers, improve at the same time our quality infrastructure, and able to screen and deliver only those searches that we believe that they are quality searches. That's first and foremost.*

278. The foregoing statements in ¶¶ 271-77 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant

84

part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

279.    On March 15, 2023, Perion filed an Annual Report on Form 20-F with the SEC, reporting on the Company's financial and operating results for the year ended December 31, 2022 (the "2022 20-F"). Defendants Gerstel and Sigron signed the 2022 20-F and signed the certifications pursuant to the Sarbanes-Oxley Act of 2002, as Perion's Principal Executive Officers, attesting to the accuracy of the statements therein.

280.    The 2022 20-F contained language that is substantially similar to the language in the 2021 20-F referenced above. (*See supra* ¶¶ 248, 250).

281.    The foregoing statements in ¶ 280 were materially false and misleading for the same reasons as the substantially similar language in the 2021 20-F. (*See supra* ¶¶ 249, 252).

282.    The 2022 20-F also listed the following as the first "advanced technological solution[] offered by Perion, which apply to the majority of consumer journey and marketing funnel, including these capabilities, which enable the Company to continuously expand its margin, demonstrating the effectiveness of its iHUB": "[t]he ability to monetize search traffic through our partnership with Microsoft Advertising (Bing), the effectiveness of which is reflected in the consistent growth of our publisher network. This is particularly important given the growing shift to Direct Response units marketing, as search represents the highest intent customers."

283.    The foregoing statements in ¶ 282 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

284.    On May 3, 2023, Perion filed with the SEC a Form 6-K, signed by Defendant

Sigron that attached a press release issued the same day, announcing the Company's financial results for the first quarter of 2023. This press release quoted Defendant Gerstel as saying that "[t]he rapid emergence of ChatGPT in the market and Microsoft's mission to further expand the role of AI within search, has elevated user interest in Bing. As a result, we experienced a 49% year-over-year growth in average daily searches, as well as a lift in new publishers." Additionally, when comparing the first quarter of 2023 to the same quarter of 2022, the press release stated that "Search Advertising Revenue increased by 15% year-over-year, accounting for 45% of revenue, primarily due to a 29% increase in the number of publishers and a 49% increase in average daily searches, offsetting a 22% decrease in RPM."

285.    The foregoing statements in ¶ 284 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

286.    On May 3, 2023, Perion also held an earnings call with analysts and investors in conjunction with its financial results for the first quarter of 2023, on which Defendants Gerstel, Sigron and Jacobson spoke. During his opening remarks, Gerstel said, when discussing the role of ChatGPT on Perion's Search business:

> This is a generational shift in the largest software category search. This is a truly profound and it's just the beginning. It means that ad search category that has been mature and faced a slow growth is now one of the most dynamic categories in ethics.
>
> Our first quarter reflected search numbers were boosted by a significant increase of 29% in the number of publishers, they sense the potential and want to be part of it. As a result, average daily traffic increased dramatically by nearly 50% year-over-year and are now close to a 30 million monetized search a day on an average basis.
>
> We believe that the massive media attention to ChatGPT 4 has driven a

material portion of this and that will continue to see growth that exceeds our
normative project. Microsoft being has a real competitive advantage now
and that cascade immediately to our business.

287.    When responding to an analyst question regarding benefits to Perion from AI,

Defendant Gerstel said, "I think that our publisher is really exciting about what's going on. Yes,

it's not being translated too much – to action with them, but they want to be part. Just to mention,

the process of approval, the publisher between us and Microsoft is matter of month. It has to do

with going to a very rigid quality process and the moment that they heard that Microsoft is going

to invest heavily around it. . . . Having said from discussion standpoint between us and Bing, I can

tell you without disclosing much, because we are in a very strict NDA, that there is a huge

co[o]poration between the two companies. One of my calls there was from [indiscernible] able to

get it here, but she's running – currently she's running the Microsoft Advertising and she basically

said that's Bing is going to be definitely something very attractive for their partner."

288.    When responding to an analyst question requesting more information about new

search publishers that came online leading to year-over-year growth, Defendant Gerstel said, "[t]he

only thing is that all of them with no exception as a very loyal customer base. And basically the

only way for those publisher to be able to monetize their effort is through search. And that's why

they're moving. I suspect that they're moving from other search companies to Bing."

289.    The foregoing statements in ¶¶ 286-88 were materially false and misleading

because Perion's search traffic under the Company's agreement with Microsoft came in significant

part from low-quality publishers, including publishers that evaded Microsoft's standards and that

dealt in fake or not monetizable traffic.

290.    On August 2, 2023, Perion published a presentation in conjunction with its financial

results for the second quarter of 2023 titled "Q2 2023 Investor Presentation" listing Defendants

Jacobson and Sigron as the Company's CEO and CFO (respectively). Perion included the following slide on "Q2 2023 Search Advertising Revenue" which reported year-over-year increases in search advertising revenue, the number of publishers and the number of daily searches:



291.    Also on August 2, 2023, Perion held an earnings call with analysts and investors in conjunction with its financial results for the second quarter of 2023, on which Defendants Jacobson and Sigron spoke. As part of his opening remarks, Defendant Jacobson said, "I've been running Perion's Search Advertising division since 2018, where we've built a thriving business model, and a deep partnership with Microsoft Advertising."

292.    As part of his opening remarks, Defendant Sigron said, "Search Advertising revenue for the second quarter grew by 21% year-over-year to $79.1 million, 44% of total revenue. Average Daily Searches during the quarter grew by 68% year-over-year to $28.6 million. This was driven by a 28% year-over-year increase in the number of Search Advertising publisher to 159 and by increased traffic from existing publisher."

293.    Also on this earnings call, when responding to a question about what he wants to achieve in search over the next 2-3 years as CEO, Jacobson said, "on search, we [are] obviously [] looking to grow. We're increasing the number of publishers through that, the number of searches, and we're constantly looking for more and more strategic publishers to be added to our network."

294.    The foregoing statements in ¶¶ 290-93 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

295.    On November 1, 2023, Perion published a presentation in conjunction with its financial results for the third quarter of 2023 titled "Q3 2023 Investor Presentation" listing Defendants Jacobson and Sigron as the Company's CEO and CFO (respectively).  Perion included the following slide on "Q3 2023 Search Advertising Revenue" which reported year-over-year increases in search advertising revenue, the number of publishers and the number of daily searches:



296.    Also on November 1, 2023, Perion also held an earnings call with analysts and investors in conjunction with its financial results for the third quarter of 2023, on which Defendants Jacobson and Sigron spoke. When responding to a question about whether there were any specific factors that were driving an uptick in searches per publisher, Jacobson said, "[o]ur business is to add more and more publishers, qualified publishers that can attract new customers of their own."

297.    The foregoing statements in ¶¶ 295-96 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

298.    On December 5, 2023, Defendant Jacobson spoke at the Raymond James TMT and Consumer Conference. When responding to an analyst question regarding a renewal of Perion's agreement with Microsoft Bing, Defendant Jacobson said, "we've been doing this search business with Microsoft and others for 14 years now. Next year is going to be 15 for the Microsoft agreement. Now, the Microsoft agreement was always for two or three years. *I've renewed the last agreement for four years, which was quite unique. And again, we're going to renew that at the end of next year. Renewals always happen very close to the date that it needs to happen.* That's not going to happen like a year before. So*, if you don't hear anything in the next two, three months, that's fine. That's by design. Now, the way it works is, we basically add supply to the Microsoft Network and other networks for Search, adding software providers, device manufacturers, and so that they can have Microsoft Search engine with the business model attached to it.* Google has the same business model. Google does that directly with software providers. We do that on behalf of Microsoft and others. *It's a pretty straightforward business model.* All the search engines on the planet are doing that for over 20 years now. *We haven't*

*invented it, we're just – we're just the best at it.*" Jacobson then continued, "***And we're connecting a lot of – a lot of the CodeFuel system into Microsoft. So, it's a lot more than just an agreement. It's a very dynamic relationship, a very fruitful relationship that goes on***."

299.    Later, when responding to an analyst question regarding where he sees the biggest growth opportunities in the search business, Jacobson said, "Adding more publishers, adding more layers to our system in between the publisher and Microsoft I think are the key to continue to grow. We're working very closely with Microsoft on adding those layers, making integration even deeper and adding more type of publishers going forward.  So, we have – we have – we have a full plan with Microsoft. We're meeting with Microsoft. Our teams are meeting with Microsoft almost on a daily basis for the past few years. I've been meeting with Microsoft at least once a quarter to think strategically, how do we take this forward? So yes, we have – we have a lot of plans on how do we take this forward, how do we grow this faster. We're feeling confident about it."

300.    The foregoing statements in ¶¶ 298-99 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

**D.** **Defendants' Materially False and Misleading Statements From 2024**

301.    On February 7, 2024, Perion published a presentation in conjunction with its financial results for the fourth quarter and full year 2023 titled "Q4 and FY 2023 Presentation" listing Defendants Jacobson and Sigron as the Company's CEO and CFO (respectively).  Perion included the following slide on "Search Advertising Revenue" which represented year-over-year increases in search advertising revenue, average daily searches and the number of publishers:



302.    On February 7, 2024, Perion also held an earnings call with analysts and investors in conjunction with its financial results for the fourth quarter and full year 2023, on which Defendants Jacobson and Sigron spoke. As part of his opening remarks, Defendant Sigron said, "[t]he quarterly search revenue significantly increased by 33% year-over-year to $114.4 million, representing an impressive 41% two-year CAGR. During the quarter, average daily searches increased by 37% over the same period last year, and the number of publishers grew by 4% year-over-year. During the last two years, we have seen budget shifts to direct response. This is a result of Perion's unique position in search, and we have been able to capitalize on that."

303.    When responding to an analyst question regarding what is driving the strong results in search for the quarter and whether the opportunity is sustainable, Jacobson said, "*as always, we're adding more publishers which are adding more searches*, but at the end of the day, it's really a market trend, right, where advertising budgets are going to shift – are now shifting into direct response in Q4. Again, it goes back to a lot of market movements, and *our ability to gain more searches*."

304.     The foregoing statements in ¶¶ 301-03 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

305.     On March 5, 2024, at the 2024 Raymond James Institutional Investor Conference, Sigron described Perion's relationship with Microsoft Bing as follows:

> So yes, as we said, and as Andrew said, 40%, 45% from our business is search. . . . once [Microsoft] announced the partnership and the investment with OpenAI, this is part of their product and part of the reason why Microsoft Bing became more popular, and this is part of the great result we have. We ended the quarter with 33% year-over-year on the revenue. And this is going very fast. And we are very happy with the result.
>
> About the relationship with Microsoft Bing, we are working with Microsoft Bing from 2010. This is almost 15 years. **We know them very well. They know us very well. We are very happy with the relationship. We feel very comfortable with the next negotiation that's going to start around, let's say, June or July. We have, as you can see from the numbers that I just shared and the pacing of this business, we are going fast and we have a better position for the negotiation. There is no rush.** We'll get to the point when we'll need to start to negotiate. And I believe that is -- it was in the last cases, it'll renew around November, December. And **we don't see any reason it will not renew, and we are very happy with our partnership**.
> …
> **[T]his is definitely a very healthy business and we are very happy with the results.**

306.     The foregoing statements in ¶ 305 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

307.     On April 8, 2024, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing the Company's preliminary financial results for the first quarter of 2024 while updating full year 2024 guidance. While this

announcement disclosed Microsoft's disappointing change in its business with Perion, it did not disclose the true reasons for that change by Microsoft. Instead, the press release perpetuated Defendants' fraud by quoting Defendant Jacobson as saying that "our relationship with Microsoft remains strong and both organizations continue to explore more opportunities to collaborate on a variety of digital advertising solutions." Jacobson added, "Management and our Board of Directors are confident that Perion is competitively well positioned for continued success within the digital advertising landscape."

308.    The foregoing statements in ¶ 307 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

309.    Also on April 8, 2024, Perion filed an Annual Report on Form 20-F with the SEC, reporting on the Company's financial and operating results for the year ended December 31, 2023 (the "2023 20-F"). Defendants Jacobson and Sigron signed the 2023 20-F and signed the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein.

310.    The 2023 20-F contains much of the same language that was contained in the 2022 20-F, referenced in ¶¶ 279-83, which was false and misleading for the reasons discussed therein.

311.    In addition, the 2023 20-F added the following additional language that was materially different from what Perion disclosed in its prior annual reports.

312.    The 2023 20-F stated, "[s]hould the methods used for the distribution of our search solution, be blocked, constrained, limited, materially changed, based on a change of policies, technology or otherwise (as has happened in the past)":

Our search providers have changed these policies with respect to method of distribution, quality of traffic sources, homepage resets, and default search resets as well as other matters numerous times in the past, having negative revenue implications for us. Since then, both companies have continued changing the policies governing their relationship with search partners like us. ***Should any of our large partnerships be deemed non-compliant, blocked or partner with another provider***, it could be difficult to replace the revenue generated by that partnership and we would experience a material reduction in our revenue and, in turn, our business, financial condition and results of operations would be adversely affected.

313.    In addition, when discussing Search Advertising, as well as Trend Information, the 2023 20-F stated that "[i]n the first quarter of 2024, we experienced a decline in our search advertising activity, attributable to changes in advertising pricing and mechanisms implemented by Microsoft in its search distribution marketplace. These adjustments led to a reduction in Revenue Per Thousand Impressions (RPM) for both Perion and other Microsoft distribution partners."

314.    The 2023 20-F also continued to promote Perion's relationship with Microsoft. When discussing Search Advertising, the 2023 20-F stated that "[s]earching is a fundamental digital behavior that signals the consumer has a high intent to complete a purchase of a product or service. We are continuously innovating and advancing our solutions to provide more value in this dynamically changing environment. We deploy advanced AI and machine learning to optimize yield for our publishers and transform search into revenue. ***At Perion we are poised to seize this shift, thanks to our longstanding relationship with Microsoft and other leading search and content partners, across more than 60 countries***."

315.    Similarly, when discussing Perion's "strong technology moat," "advanced technological solutions," and its "capabilities that enabled it to achieve above industry average margins," the 2023 20-F listed "[t]he ability to monetize search traffic through our partnerships

with search engines such as Microsoft Advertising (Bing), and others through innovative publisher-centric solutions and online quality control and monitoring systems."

316.    The foregoing statements in ¶¶ 312-15 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

317.    On May 8, 2024, Perion filed with the SEC a Form 6-K, signed by Defendant Sigron that attached a press release issued the same day, announcing the Company's financial results for the first quarter of 2024.  The press release quoted Defendant Jacobson as saying that "Perion is a resilient and agile company and we are confident in our strategic positioning to overcome challenges, including recent changes in advertising pricing and mechanisms introduced by Microsoft Bing."

318.    Also on May 8, 2024, Perion held an earnings call with analysts and investors in conjunction with its financial results for the first quarter of 2024, on which Defendants Jacobson and Sigron spoke. As part of his opening remarks, Defendant Jacobson said, "[i]t is common for major tech companies, such as Microsoft, to periodically adjust their pricing strategies. Microsoft's advertising pricing and mechanism changes do not affect our contract. You'll notice that despite our announcement about the changes that Microsoft made, our search activity actually grew 26% year-over-year in Q1." Jacobson added, "[w]e believe that our relationship with Microsoft remains strong with ongoing collaboration between our teams. This event didn't change Perion execution abilities and future possibilities." Jacobson later added, "Perion has been granted two TAG certifications for 2024, symbolizing our unwavering commitment to integrity and quality in the digital advertising space."

319.    Sigron said on this call, "[w]e experienced a decline in search advertising activity that is attributed to changes in advertising prices and new mechanism that Microsoft being implemented in its search distribution marketplace. These changes in pricing strategies affected all Microsoft's distribution partners, our relationship with Microsoft remains strong."

320.    When responding to an analyst question regarding what specifically changed at Bing that impacted Perion, Defendant Jacobson said, "Microsoft changed the mechanism of pricing for the distribution channels, right? And the reason it affected our publishers is, at the end of the day, it all needs to make economic sense for them. I mean, they have other options, right? They can switch between vendors. They can do whatever they want. And this is exactly what happened." In his closing remarks, Defendant Jacobson said that "[e]ven though we saw a big change lately, we are confident in our future" and "we have all the resources needed to succeed."

321.    The foregoing statements in ¶¶ 317-20 were materially false and misleading because Perion's search traffic under the Company's agreement with Microsoft came in significant part from low-quality publishers, including publishers that evaded Microsoft's standards and that dealt in fake or not monetizable traffic.

## VI.    THE TRUTH BEGINS TO EMERGE

322.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

323.    Throughout the Class Period, the price of Perion securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

324.    The price of Perion securities significantly declined when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from

the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Perion securities, Plaintiffs and other Class members have suffered significant losses and damages.

325.    In particular, on April 8, 2024, before the market opened, Perion revealed reduced revenue expectations caused by Microsoft Bing's changes to search advertising pricing and mechanisms. Perion reported decreased expectations for Q1 2024 revenue and adjusted EBITDA and also significantly reduced its full-year revenue guidance. The Company announced "preliminary financial results for Q1 2024 and updated its full year 2024 guidance" because "[i]n the first quarter of 2024, Perion experienced a decline in Search Advertising activity, attributable to changes in advertising pricing and mechanisms implemented by Microsoft Bing in its Search Distribution marketplace. These adjustments led to a reduction in Revenue Per Thousand Impressions (RPM) for both Perion and other Microsoft Bing distribution partners. These changes contributed to decreased search volume."

326.    Perion also stated in this announcement that "[a]s a result of the Microsoft Bing modifications, Perion expects Q1 2024 revenue and adjusted EBITDA of $157 million and $20 million, respectively. For the full year 2024, the Company currently expects revenue and adjusted EBITDA of $590-$610 million and $78-$82 million, respectively. The decrease is mainly attributed to Search Advertising, and to a limited extent to the web video activity. The rest of the business indicators remain positive." This was a dramatic decrease from the $860-$880 million in revenue and $178-$182 million in adjusted EBITDA that Perion projected for 2024 as recently as February 7, 2024, when it announced its results for 2023.

327.    On this news, the price of Perion common stock declined by $8.61 per share, or

approximately 41%, from $21.11 per share on April 5, 2024 (the prior trading day), to close at $12.50 on April 8, 2024. Perion's shares traded at an unusually high volume on April 8, 2024 that was over 12 times the 20-day moving average volume.

328.    The changes by Microsoft that led to this decline in Perion's stock price resulted from the low quality of Perion's publishers that sent search traffic to Microsoft and the true nature of Perion's relationship with Microsoft, which Defendants misrepresented during the Class Period.

329.    On April 8, 2024, Lake Street Capital Markets published a report titled "Microsoft Change Upends Perion Outlook; Lowering Rating To Hold And PT To $16." This report stated that "Perion's business model took a body blow when Microsoft changed its search pricing mechanism. A few weeks ago, Microsoft unilaterally lowered the RPMs charged to advertisers for indirect search traffic from Microsoft partners such as Perion. Under our prior 2024 model, we had 47% of Perion revenue coming from the Search segment and over 80% of that Search revenue was via Microsoft. Going forward from April 1st, our new model anticipates 21% of revenue coming from the Search segment."

330.    Lake Street also explained, in a report published on May 8, 2024, titled "Adjusting To Life On Less Microsoft Revenue, Guidance Maintained; Reiterate Hold And $16," that "the dramatic changes made by Microsoft to its search advertising pricing mechanism will be fully reflected in Q2 and will have a significant impact on the remainder of the year. Our total revenue decreased to $600M in 2024, down from our prior $860M estimate. The company is already feeling the effects of the changes. Its search publisher count has been in decline since the end of Q1, and RPMs and daily searches are heading lower." This report also explained that "new advertising pricing and mechanisms implemented by Microsoft Bing in its search distribution marketplace have led to a decline in search activity, and are expected to lead to lower RPM, daily searches, and

the number of publishers on the platform. This trend is expected to be fully reflected in Q2 and 2024. . . . Pricing changes and other mechanisms implemented by Microsoft Bing have significantly reduced RPMs, daily searches, and publishers and are expected to be fully reflected in Q2 and 2024 in the Search segment."

331.    Similarly, on April 8, 2024, Oppenheimer published a report titled "MSFT Finally 'Binged' Search Business, Reducing Payouts for Indirectly Sourced Traffic—Reducing Target to $17." This report explained that "[b]eginning in late 1Q, MSFT began delineating 3P traffic vs. 1P (owned properties) with different pricing terms and prioritizing higher-value search demand to 1P sites. Effectively, Bing now pays less for indirectly sourced search traffic, and pushes higher monetization demand to owned properties, affecting PERI and other Bing distribution partners." Based on this news, Oppenheimer lowered its price target for Perion's stock from $35 per share to just $17 per share.

332.    Perion, however, continued to misrepresent the nature of its business, as described above. (*See supra* ¶¶ 307-21). The Company's statements on April 8, 2024 were false and misleading because they did not disclose the real reason for Microsoft's changes in its relationship with Perion and continued to misrepresent Perion's relationship with Microsoft as strong. For example, even in its April 8, 2024 announcement, the Company stated, quoting Defendant Jacobson, that "[o]ur relationship with Microsoft remains strong and both organizations continue to explore more opportunities to collaborate on a variety of digital advertising solutions." The Company also quoted Jacobson as concluding that "Perion is competitively well positioned for continued success within the digital advertising landscape, and thus approved an increase to our buyback program from $50 million to up to $75 million, capitalizing on our strong cash position."

333.    Analysts believed Perion that its relationship with Microsoft was still strong. For

example, Roth MKM wrote in a note dated April 9, 2024, titled "Downgrading to Neutral on Demise of Search Business," "[r]ecent discussions with management indicate that PERI believes the relationship remains strong and that a renewal is likely. Management also indicated the Search business remains profitable at lower levels. We expect the run rate for Search revenue to decline from nearly $400M to roughly $120M. The vast majority of this $120M Search run rate is still from Bing."

334.    Similarly, Needham stated in a report on May 8, 2024, titled "PERI 1Q24 Analysis and FY24 Outlook," that "PERI believes its relationship with Microsoft remains strong, with close ongoing collaboration between teams. This event didn't change PERI's execution abilities or future possibilities with MSFT." Needham's main set of assumptions for the Company's future projected "Strong revenue growth and margin upside driven by PERI's data advantages from its Bing search engine and its Hub and Spoke organizational design."

335.    Then, on June 10, 2024, before the market opened, Perion announced a further decline in its relationship with Microsoft. The Company stated that "[i]n recent days, Perion was notified by Microsoft Bing of its decision to exclude a number of publishers from its search distribution marketplace. Similar notices were provided to other Microsoft Bing search distribution partners. As a result of these actions, in addition to the changes in advertising pricing and mechanisms implemented by Microsoft Bing during the first quarter of 2024, search revenue from our agreement with Microsoft Bing is expected to represent less than 5% of Perion's revenue in the second half of 2024. As the company continues to work with other search engines, our agreement with Microsoft Bing is no longer material to Perion." Perion thus "update[ed] its second quarter and full-year guidance to reflect these actions by Microsoft Bing. While these actions are the primary driver of the reduced EBITDA guidance, Perion has also seen a recent decline in

revenue from standard video and display formats. The company believes these declines reflect market conditions as well as a transition to higher premium formats that offer advertisers higher ROI. Perion continues to see increased revenue from higher premium formats but not at a level sufficient to offset the revenue decrease from this change." Defendant Jacobson stated that "[t]he recent changes Microsoft Bing implemented to its Search distribution marketplace are unfortunate and significantly impacted our Search Advertising business." Perion thus lowered its revenue guidance for the second quarter to just $106 million to $108 million, and its adjusted EBITDA for that quarter to just $6.5 million to $7.5 million (from $118 million to $122 million in revenue and $10 million to $12 million in adjusted EBITDA that Perion projected when it announced its first quarter results on May 8, 2024). Perion also lowered its full year 2024 revenue guidance to $490 million to $510 million and its full year adjusted EBITDA guidance to $48 million to $52 million.

336.    On this news, the price of Perion common stock declined by $3.71 per share, or approximately 30%, from $12.32 per share on June 7, 2024 (the prior trading day), to close at $8.61 on June 10, 2024. Perion's shares traded at an unusually high volume on June 10, 2024 that was over 9 times the 20-day moving average volume.

337.    This further change by Microsoft also resulted from the low quality of Perion's publishers that sent search traffic to Microsoft and the true nature of Perion's relationship with Microsoft, which Defendants misrepresented throughout the Class Period.

338.    For example, Lake Street stated in a report that it published on June 10, 2024, titled "Cuts Guidance, Battered By Another Round Of Microsoft Bing Changes; Lowering Price Target To $10," that "Microsoft Launches Phase II Of Overhaul." This report explained that "[w]e lowered our rating on Perion on April 8th as Microsoft Bing executed Phase I of its Perion relationship overhaul by unilaterally revising the revenue payout for Perion and other suppliers of

search traffic to Bing. What we learned from Perion today is that, in Phase II, Microsoft chose to exclude a number of Perion publishers from its search marketplace." The report also stated that "[g]iven the dramatic overhaul of its Microsoft relationship in the last 60 days, we lack confidence in our revised forecast." It noted that "Perion continues to reel from the decision by Microsoft Bing to exclude a number of publishers from its search distribution marketplace."

339.    Needham published a June 10, 2024 report titled "Downgrade to Hold on Microsoft News," making clear that this announcement disclosed new information that Perion had not disclosed on April 8, 2024. This was now the "second time in 2 months that PERI has materially lowered its 2024 revenue projections from MSFT." Needham explained that "[t]his morning, PERI announced that MSFT has listed dozens of publishers that would no longer show up in ANY Bing search result, implying that those publishers would no longer receive any money from Bing. Since some of these publishers are PERI's clients, this again lowers PERI's search ad revs going forward. ***We assume MSFT believes that these publishers it listed are low quality websites.***" As a result, Needham downgraded Perion's stock to "hold, because we are now less comfortable that MSFT will renew its partnership with PERI after the current contract ends in 4Q25. In addition, for the second time in 2 months, we materially lower our projections for PERI for 2024 and 2025."

340.    Similarly, a June 10, 2024, article on *Seeking Alpha*, titled "Perion Network: Clickbait Disaster," explains that Microsoft excluded Perion's publishers because "Microsoft Bing is apparently cracking down on so-called 'Made for Advertising'" sites and connected this to Perion having "shut down its MFA site network [in May 2024] after its business practices had been exposed in an industry report." (*See supra* ¶¶ 128-29). Furthermore, this article noted that "the search division disaster appears to have impacted the company's core advertising business, with customers likely pulling budgets in an attempt to avoid potential association with the

company's MFA practices." This article also stated that, "[q]uite frankly, it's disappointing to see that the company's strong growth and decent profitability recently was at least partially the result of an aggressive MFA strategy."

341.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Perion securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    The Individual Defendants' Motive to Commit Fraud

342.    Defendants Gerstel, Jacobson, and Sigron had a financial motive to commit fraud. The Individual Defendants sold significant portions of their holdings of Perion securities during the Class Period at artificially inflated prices before the truth started to be revealed on April 8, 2024. (*See supra* ¶¶ 178-86).

343.    Defendants Gerstel, Jacobson, and Sigron also made substantial profits from the compensation that they received during the Class Period, both in the form of cash and equity awards, a significant portion of which was tied to Perion's financial results that they artificially inflated. (*See supra* ¶¶ 187-91).

### B.    The Individual Defendants' Knowledge of, or Recklessness as to, the Fraud

344.    Each of the Individual Defendants also had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described above in the Substantive Allegations section.

345.    Defendants Gerstel, Jacobson, and Sigron's scienter as to the falsity of the alleged misstatements and omissions is established by their signing of Perion's SOX certifications that attested to the accuracy of Perion's SEC filings. Before vouching for the accuracy of the statements made in Perion's SEC filings, the certifying Defendants were obligated to familiarize themselves

with the contents of the filings and the underlying operations described therein.

346.    Defendants' scienter is further established by the statements of confidential witnesses described above. CW 1 discussed with their supervisor, who reported to Defendant Jacobson, the improper practices that CodeFuel used to evade Microsoft's publisher standards. CW 1's supervisor was not only aware of these practices, but also encouraged employees to implement them. In addition, CW 1 explained that everyone at CodeFuel knew about these practices and there was no way that Jacobson, the head of CodeFuel before becoming Perion's CEO, did not know about them. Moreover, CW 1's statements are bolstered by the corroboration from multiple other confidential witnesses that independently described the same types of practices at Perion related to low-quality publishers that the Company dealt with.

347.    Defendant Jacobson's scienter is further established by his direct involvement with, and oversight of, the Company's Search business and its agreement with Microsoft. Jacobson served as the General Manager of CodeFuel until he was promoted to CEO of Perion, effective August 1, 2023. When this promotion was announced, Defendant Gerstel stated that Jacobson was the "ideal person to lead Perion forward" because he "has significantly modernized and enhanced our search advertising platform, driving our revenue growth and cash generation, while forging a strong and collaborative relationship with Microsoft Advertising." Jacobson also described himself at that time as "the main contact with Microsoft, with the entire executives at Microsoft Advertising, have been for the past few years. I negotiated the last agreement and obviously I'll negotiate the next agreement."

348.    Defendant Gerstel's scienter is also established based on his involvement in Perion's agreement with Microsoft. The centrality of his role in the relationship with Microsoft is shown by Gerstel being awarded options to purchase 225,000 shares of Perion stock in connection

with the Company's renewal of its strategic partnership agreement with Microsoft in November 2020. Indeed, CW 1 stated that both Gerstel and Jacobson had a direct relationship with Microsoft.

349.    Defendant Katzir's scienter is also established because he founded Content IQ and then served as its Co-CEO after Perion acquired it in January 2020. He was therefore aware of Content IQ's business being based on Made for Advertising websites and clickbait.

350.    The Individual Defendants making detailed statements about the topics at issue, including the quality of Perion's publishers and its relationship with Microsoft, also demonstrates their scienter as to the underlying factual information related to these topics. *See, e.g.*, ¶ 277 (Gerstel discussing in detail "what is a quality searcher" for Microsoft), ¶ 275 (Jacobson discussing his "transform[ing] the search business" by "solidifying our key relationship with Microsoft Advertising . . . and focusing on quality"), ¶ 298 (Jacobson discussing renewal of Microsoft agreement as "quite unique"), ¶ 299 (Jacobson stating that he has "been meeting with Microsoft at least once a quarter to think strategically"), ¶ 305 (Sigron discussing Perion's relationship with Microsoft Bing), ¶¶ 319-20 (Sigron and Jacobson discussing decline in publisher search revenue from Microsoft), ¶ 205 (Katzir discussing Content IQ in detail).

351.    Defendants Jacobson and Sigron's scienter is further established by their admitting, in Perion's 2023 Form 20-F that some of Perion's "supply inventory is known as 'Made for Advertising' and is less attractive to or excluded by some of our advertising customers," including "[r]estrictions from advertisers, DSPs or SSPs" and that "advertising customers may pay less or exclude supply inventory on publishers websites that are 'Made for Advertising'," as well as that "traffic from low-quality sources, including websites with irrelevant content or poor user engagement have impacted and may negatively impact the effectiveness of our search advertising."

352.    In addition, Defendant Gerstel's departure from Perion when he was replaced as

CEO by Defendant Jacobson, effective August 1, 2023, further supports Defendants' scienter.

353.    The Individual Defendants' scienter is also established because the alleged misstatements and omissions here concerned Perion's core operations. Perion described itself as "highly dependent" on its relationship with Microsoft and their agreement accounted for 37%, 35% and 34% of Perion's revenue, in 2021, 2022 and 2023. It also accounted for between 74% and 82% of the revenue from Perion's Search Advertising business during that time. The Individual Defendants, by virtue of their roles in senior management and involvement in Perion's core operations, would have had knowledge of the true nature of Perion's core businesses during the Class Period. In addition, Defendants had access to reports and communications describing these operations.

354.    Perion had scienter as to the false and misleading nature of the statements described above based on the scienter of the Individual Defendants. In addition, their scienter can be inferred because these statements about such crucial issues would have been approved by other corporate officials that knew they were false or misleading.

## VIII.   NO SAFE HARBOR

355.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

356.    In the alternative, to the extent that the statutory safe harbor is determined to apply

to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer or top management of Perion who knew that the statements were false when made.

## IX.    CLASS ACTION ALLEGATIONS

357.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of two classes:

   a. U.S. Class: on behalf of all persons who purchased Perion's publicly traded common stock between February 9, 2021, and June 7, 2024, both dates inclusive (the "Class Period"), on the NASDAQ stock exchange or any other trading center within the United States, and were damaged thereby, Plaintiff asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act");

   b. TASE Class: on behalf of all persons who purchased Perion's publicly traded common stock between February 9, 2021, and June 7, 2024, both dates inclusive (the "Class Period"), on the Tel Aviv Stock Exchange ("TASE") (on which it is dual listed), and were damaged thereby, Plaintiffs assert violations under the parallel provisions under the Israel Securities Law, 1968.

Excluded from the Class are Defendants herein, the officers and directors of Perion, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, or any entity any Defendant owns or controls (or owned or controlled during the Class Period).

358. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Perion securities were actively traded on the NASDAQ and the TASE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Perion or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

359. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

360. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

361. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein, or for the TASE Class, whether parallel provisions under Israeli law were violated;

- whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the business, operations and management of Perion;

- whether the Individual Defendants caused Perion to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading

statements;

- whether the prices of Perion securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

362.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

363.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Perion securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and TASE, and was covered by multiple analysts during the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Perion securities between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

364.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to

a presumption of reliance upon the integrity of the market.

365.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed herein.

## XI.    CAUSES OF ACTION

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)**

366.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

367.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

368.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC.

369.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

370.    Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class

who purchased or acquired Perion securities.

371.    These Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and the Class; and (ii) cause Plaintiffs and the Class to purchase or acquire Perion securities.

372.    Defendants also were individually and collectively responsible for making the false and misleading statements and omissions alleged herein by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Perion's financial condition.

373.    By virtue of their actions, positions, and associations with Perion, these Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, these Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

374.    During the Class Period, Perion securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying upon the price of the Perion securities, the integrity of the market for the securities and/or upon statements disseminated by

Defendants, purchased or acquired Perion securities at artificially inflated prices and were damaged thereby. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or acquired said securities at those prices.

375.    By purchasing or acquiring their Perion securities at these artificially inflated prices, Plaintiffs and the Class members suffered economic losses, which losses were a direct and proximate result of Defendant Perion, and the Individual Defendants' fraudulent conduct.

376.    By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants)

377.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

378.    During the Class Period, the Individual Defendants participated in the operation and management of Perion and conducted and participated, directly and indirectly, in the conduct of Perion's business affairs. Because of their senior positions, they knew the adverse non-public information about Perion's statements described above.

379.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Perion's financial condition and results of operations, and to correct promptly any public statements issued by Perion that had become materially false or misleading.

380.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Perion disseminated in the marketplace during the Class Period concerning Perion's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Perion to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Perion within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Perion securities.

381.    Each of the Individual Defendants, therefore, acted as a controlling person of Perion. By reason of their senior management positions and/or being directors, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Perion to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Perion and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

382.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Perion.

<u>**COUNT III**</u>

**For Violation of the Israel Securities Law, 1968**
**(Brought by the TASE Class Against All Defendants for**
**Purchases Made on the TASE)**

383.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

384.    Throughout the Class Period, Perion's common shares were dually listed on both the NASDAQ and the TASE.

385.    Israeli securities law provides unique treatment for securities of certain firms that

are "dual listed," *i.e.*, available for trading on both the TASE and the national U.S. stock markets. For dual-listed firms like Perion incorporated in Israel, Israeli law applies the reporting requirements (including the anti-fraud provisions) of the country of primary listing. *See* Israeli Securities Law, 1968 ("Securities Law"), §§ 1, 35T, 35DD, 35EEE.

386.    Accordingly, to construe the propriety of Perion disclosures to investors, Israel **applies U.S. laws and regulations**, including the anti-fraud provisions of the U.S. securities laws, to enforce disclosure obligations for dual-listed stocks. *See* Securities Law, §§ 35T, 35 DD, 35EE; *Verifone Holdings, Inc. v. Stern*, Class Action 3912-01-08, decision rendered Nov. 16, 2008; *Stern* v. *Verifone Holdings, Inc.*, Class Action 3912-01-08, decision rendered Aug. 25, 2011, subsequent to and in light of *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010). According to Israeli case law, liability for violations thereof is pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act, which apply to the claims arising from trades made by Plaintiffs on the TASE.

387.    During the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, Defendants carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Perion common stock; (b) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (c) cause Plaintiffs and other members of the Class to purchase Perion common stock at inflated prices in reliance on Defendants' false and misleading statements made knowingly or with deliberate recklessness by Defendants; and (d) cause them losses when the truth was revealed.

388.    During the Class Period, in violation of Section 20(a) of the Exchange Act, the Individual Defendants had control over Perion and made the material false and misleading

statements and omissions on behalf of Perion within the meaning of Section 20(a) of the Exchange Act, causing damages to Plaintiffs and other Class members. By virtue of their controlling shareholder status, executive positions, board membership, and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be false and misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

389.    Alternatively, if this Court concludes that Israeli, not U.S., law applies to the claims arising from Plaintiffs' purchases of common shares on the TASE, the following provisions and causes of action apply to those claims:

a.    *Regulations 3-5 of the Securities Regulations (Periodic and Immediate Reports of Foreign Corporation), 2000 promulgated under the Securities Law* – Perion breached its reporting obligations under the "foreign law" - namely, U.S. law - defined in § 1 of the Securities Law as "the law applying to a foreign corporation because its securities are listed for trade on a foreign stock exchange, including the rules of that foreign stock exchange." Specifically, Perion failed to submit and publicize reports, notices, and other documents of the adverse information contained herein as required under U.S. law, in a timely fashion as required under U.S. law or earlier, on issues required under U.S. law. Perion thereby caused damage to Plaintiffs.

b. *§ 36 of the Securities Law and Regulations 30, 36 of the Securities Regulations (Periodic and Immediate Statements), 1970 thereunder* – Perion failed to submit immediate reports in a timely fashion as required under Regulation 30. According to Regulation 36(a): "An [immediate] report shall provide, with respect to any event or matter that deviates from the corporation's ordinary course of business, the details of [such an event's or matter's] nature, scope or potential result which will have or could have a significant effect on the corporation; the same details will be provided with respect to any event or matter that could significantly affect the price of the corporation's securities." Moreover, even if Perion may have delayed timely reporting pursuant to Regulation 36(b), once it became aware of rumors and other public information, it breached its obligation under Regulation 36(d) to submit an immediate report and refer therein to the correctness of the information that has already been made public. Perion thereby caused damage to Plaintiffs.

c. *§§ 31-32A, 34, 38B-38C of the Securities Law* – Read together, these sections impose liability, *inter alia*, on a corporation, a director of a corporation, its general manager, and a controlling shareholder thereof with regard to a misleading item that was in a report, notice or document that the corporation filed pursuant to this Law - to anyone who sold or purchased securities in the course of trading on a stock exchange or over the counter, for damage caused to them by the inclusion of a misleading item in those disclosures. A "misleading item" is defined in § 1 of the Securities Law as "including anything that is likely to mislead a reasonable investor, and any matter the omission of which is likely to mislead a reasonable

117

investor." Specifically, § 32A(c) denies the safe harbor protection for "forward looking information" under this Section from "a party that knew that the forward-looking information would not be realized." Section 32A(d) further excludes from the safe harbor's purview "facts, figures or other details in a prospectus, opinion, report, review or certificate, as applicable, which served as a basis for forward-looking information." Defendants are liable to Plaintiffs under these provisions.

d. *§ 52K of the Securities Law* – This general civil liability provision imposes liability on an issuer, the directors of the issuer, its general manager, and on a controlling shareholder of the issuer for any damage caused to a holder of the issuer's securities by virtue of the issuer's violation of the provisions of this Law or of regulations hereunder. Defendants are liable to Plaintiffs under this provision.

e. *§§ 35-36 of the Torts Ordinance [New Version]* – These sections impose general liability in torts for negligence towards any person where a reasonable person in like circumstances should have foreseen that in the ordinary course of things the former person may be harmed by the latter person's conduct or omission. Defendants are liable for damage caused to Plaintiffs by the former's misrepresentations and omissions as detailed in the above paragraphs.

f. *§ 63 of the Torts Ordinance [New Version]* – This section imposes general liability in torts for breach of statutory duty on any person who failed to comply with a duty imposed on him according to any statute, excepting this Ordinance, where the statute, according to its correct construction, is meant for the protection or benefit of another person, the breach caused damage to that person of the kind or

nature of damage meant by the statute, unless that statute was meant to exclude such remedy. Defendants are liable for damage caused to Plaintiffs by the former's failures to comply with their duties under the Securities Law as detailed in the above paragraphs.

## XII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XIII.    <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury.

Dated: September 20, 2024

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael Grunfeld* _____
Jeremy A. Lieberman
Michael Grunfeld
Brandon M. Cordovi
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
mgrunfeld@pomlaw.com
bcordovi@pomlaw.com

Orly Guy

Eitan Lavie
HaShahar Tower
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111
Email: oguy@pomlaw.com
eitan@pomlaw.com

*Attorneys for Lead Plaintiffs*