```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/27/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                              :    24-CV-2860 (VEC)
In re Perion Network Ltd. Securities Litigation               :
                                                              :    OPINION & ORDER
------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

Lead Plaintiffs,[1] individually and on behalf of all others similarly situated, bring this securities fraud action against Perion Network Ltd. ("Perion" or the "Company"), and directors and officers Doron Gerstel, Tal Jacobson, Maoz Sigron, and Asaf Katzir (collectively, "Defendants").  Plaintiffs allege that Defendants committed securities fraud when they made material misrepresentations in their public filings and remarks in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), *see* 15 U.S.C. §§ 78j(b), 78t(a), Rule 10b-5, *see* 17 C.F.R. § 240.10b-5, and the Israel Securities Law, 1968, §§ 1, 35T, 35DD, 35EEE.  Defendants moved to dismiss for failure to state a claim.  For the following reasons, Defendants' motion is GRANTED.

## BACKGROUND[2]

This is a securities fraud action brought on behalf of all persons who purchased or acquired Perion stock between February 9, 2021, and June 7, 2024 (the "Class Period").  Am.

---

[1]   Lead Plaintiffs are Menora Mivtachim Insurance Ltd. ("Menora Insurance"), Menora Mivtachim Pensions and Gemel Ltd. ("Menora Pensions & Gemel"), Menora Mivtachim Vehistadrut Hamehandesim Nihul Kupot Gemel LTD (collectively, "Menora"), and Clal Insurance Company Ltd., Clal Pension and Provident Ltd., and Atudot Pension Fund for Employees & Independent Workers Ltd. (collectively "Clal" and, together with Menora, "Menora and Clal") (collectively, "Plaintiffs").

[2]   The Court accepts the factual allegations in the Amended Complaint as true but may also consider any statements contained in Perion's public filings or other documents relied upon by Plaintiffs in the Amended Complaint.  *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166, 171 (2d Cir. 2021) ("[C]ourts may consider any . . . statements or documents incorporated into the complaint by reference, legally required public disclosure documents . . ., and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." (citation and internal quotation marks omitted)).

1

Compl., Dkt. 64, ¶ 1.  Perion is a technology company that provides digital advertising products and services.  *Id.* ¶ 30.  The Company serves as an intermediary between advertisers seeking to place ads and owners of the advertising space.  *Id.* ¶¶ 37, 40.  Its stock trades on the NASDAQ and the Tel Aviv Stock Exchange ("TASE"), both highly efficient markets.  *Id.* ¶ 30.

Gerstel served as CEO and Director of Perion from April 2017 through August 2023 and was a director from May 2018 to November 2023.  *Id.* ¶ 31.  Jacobson succeeded Gerstel as CEO; prior to that appointment he was General Manager of CodeFuel, the Company's division that runs its search advertising business.  *Id.* ¶ 32.  Sigron was the Company's CFO during the Class Period.  *Id.* ¶ 33.  Katzir co-founded Content IQ — a company that Perion acquired in January 2020 that purportedly engaged in clickbait practices — after which he served as Content IQ's co-CEO through March 2021.  *Id.* ¶¶ 34, 117.

Plaintiffs allege that, during the Class Period, Defendants made several misrepresentations or omitted material facts pertaining to Perion's "search advertising" business.  Through that business line, Perion enables third-party "search publishers," such as browser extensions and apps, to distribute search engines to users on the publishers' platforms.  *Id.* ¶¶ 4, 32, 46.  In return, Perion receives a share of the ad revenue generated from searches using those search engines.  *Id.* ¶ 47.  Chief among the search engines that contracted with Perion was Microsoft Bing; Perion disclosed that it was "highly dependent" on its relationship with Microsoft.  *Id.* ¶¶ 51, 58.  From 2021 through 2023, search revenue generated from Perion's relationship with Microsoft accounted for approximately a third of Perion's total revenue, and more than two-thirds of Perion's search revenue.  *Id.* ¶¶ 58–59.[3]  Under Perion's Bing Services

---

[3] During those years, Microsoft's contribution to Perion's total revenue ranged from 34% to 37%, and its contribution to Perion's search revenue ranged from 74% to 82%.  Am. Compl. ¶¶ 58–59.

Framework Agreement with Microsoft (the "Agreement"), Microsoft had sole discretion to approve Perion's search publishers before Perion could promote Bing on the publishers' platforms. *Id.* ¶ 137; Seshens Decl., Dkt. 77, Ex. F ("Agreement") §§ 5.2, 5.3 and Sched. 1 at 16–17, §§ 3.1(c), and 3.5. Thus, the publishers that sent Microsoft traffic through Perion's placement of Bing had to meet Microsoft's standards for traffic quality. Am. Compl. ¶ 137.

To that end, throughout the Class Period, Defendants made several statements regarding the quality of the searches Perion facilitated. A February 10, 2022, Form 6-K signed by Sigron quoted Perion's leadership on the maintenance of search quality standards. *See id.* ¶ 244 (Gerstel: Perion and Microsoft "remain committed to building our publisher network while maintaining the impeccable quality standards which matter so much to both of us."); ¶ 245 (Jacobson: Perion won Microsoft Advertising's Supply Partner of Year Award "through ongoing technology investments and a relentless focus on quality."). In a press release dated April 28, 2022, Gerson similarly claimed that Perion would continue to build its "network of publishers, while maintaining the impeccable quality standards" that mattered to Perion and Microsoft, and Jacobson stated that the companies' mutual success was driven, in part, by their "focus on quality to maximize user engagement and brand safety." *Id.* ¶¶ 253–54. That same day, Perion held an earnings call during which Gerstel stated that Perion was looking "to increase the number of quality searches" with its partners. *Id.* ¶ 259.

On a February 8, 2023, earnings call, in response to a question regarding whether Microsoft could decide not to renew the Agreement following its adoption of the artificial intelligence ("AI") chatbot ChatGPT, Gerstel explained that Microsoft intended to recoup its investment in ChatGPT by "rely[ing] more on partners like CodeFuel to drive more searches, underlin[ing] quality searches that they're able to monetize, and very much generating a healthy

business for advertisers." *Id.* ¶ 276. On a May 3, 2023, earnings call, Gerstel, discussing the benefits to Perion of AI, highlighted the "very rigid quality process" the Company imposes on publishers that send search traffic through to Microsoft. *Id.* ¶ 287. Similarly, on a November 1, 2023, earnings call, Jacobson stated that Perion's business was to attract "qualified publishers that can attract new customers of their own." *Id.* ¶ 296.

In Plaintiffs' telling, contrary to Defendants' public statements, Perion's business was in fact based on low-quality publishers that sent low-quality traffic to Microsoft, including fake users, less-engaged users from clickbait websites, and searches from non-monetizable geographic regions that Microsoft's standards were designed to avoid. *Id.* ¶¶ 7–15, 78, 94–98, 107, 132–54. Plaintiffs' allegations are based in part on an April 4, 2024, Wall Street Journal article about publications such as *Forbes* that operate "made for advertising" websites; such sites are clogged with advertisements. *Id.* ¶¶ 107–13. Plaintiffs also rely on follow-up reporting that identified Content IQ and Perion as perpetrators of clickbait practices. *Id.* ¶¶ 114–29. Plaintiffs corroborate their allegations with information from Confidential Witnesses ("CWs") who worked at CodeFuel and Perion; the CWs claim that Perion sent fake or low-quality traffic to Microsoft. *Id.* ¶¶ 132–77.

On April 8, 2024, Perion announced preliminary financial results for the first quarter of 2024 that decreased expectations for first-quarter revenue and full-year revenue guidance due to decreased search volume. *Id.* ¶ 325. The Company explained that it "experienced a decline in Search Advertising activity, attributable to changes in advertising pricing and mechanisms implemented by Microsoft Bing in its Search Distribution marketplace;" those changes reduced revenue "for both Perion and other Microsoft Bing distribution partners." *Id.* Perion's stock declined that day from its prior day close of $21.11 per share to $12.50. *Id.* ¶ 327. Then, on

4

June 10, 2024, Perion announced that Microsoft Bing had decided to exclude several publishers from its search distribution marketplace; as a result, Perion stated that the Agreement was "no longer material to Perion." *Id.* ¶ 335.  In each of the prior three years, search revenue in connection with the Agreement represented at least one-third of Perion's revenue, *id.* ¶ 58, but following the exclusion of certain publishers, Perion projected that revenue through the Agreement would represent less than five percent of the Company's revenue, *id.* ¶ 335.  Perion's share price slid again, closing at $8.61 after a prior day close of $12.32.  *Id.* ¶ 336.

      Plaintiffs allege that, because Perion directed low-quality search traffic to Microsoft, its statements regarding the quality of its publishers and searches were false or misleading.  *Id.* ¶¶ 8–9, 55–56, 78, 130, 198–200, 244–46, 253–55, 259–60, 275–78, 287, 289, 296–97.  Plaintiffs also point to more general statements Defendants made regarding search traffic or publishers that do not mention quality but were nevertheless allegedly misleading because certain publishers and search traffic were low quality.  *Id.* ¶¶ 120, 192–97, 201–43, 247–252, 256–58, 260–74, 278–286, 288–89, 290–95, 297, 301–04, 309–10.  For the same reason, Plaintiffs claim that certain of Defendants' statements regarding the strength of the Company's relationship with Microsoft, as well as the April 8, 2024, disclosure about Microsoft's revised guidance and exclusion of publishers, were misleading.  *Id.* ¶¶ 21, 77, 298–300, 305–08, 311–21; *see also id.* ¶¶ 5, 61.

      On April 16, 2024, this action was filed.  *See* Compl., Dkt. 1.  On August 5, 2024, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *see* 15 U.S.C. § 78u-4(a)(3)(B), the Court appointed Plaintiffs to serve as lead plaintiffs.  *See* Order, Dkt. 58.  On September 20, 2024, Plaintiffs filed the operative Amended Complaint.  *See* Am. Compl., Dkt. 64.  On November 4, 2024, Defendants moved to dismiss.  *See* Dkts. 75–77.

**DISCUSSION**

### I. Standard of Review

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion to dismiss, the Court draws all reasonable inferences in the light most favorable to the plaintiff. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013) (citation omitted). The Court is not required, however, "to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Because Plaintiffs' claims are brought under the Exchange Act, Plaintiffs must "state[] with particularity" the circumstances constituting fraud. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)). In addition, the PSLRA requires a complaint to "'specify each statement alleged to have been misleading[ ] [and] the reason . . . why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023) (quoting 15 U.S.C. § 78u-4(b)(1), (2)(A)).

### II. Plaintiffs Fail to State a Securities Fraud Claim

To state a claim for securities fraud under Section 10(b) and Rule 10b-5(b), a private "plaintiff must plead '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

causation.'" *Id.* (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

A plaintiff establishes a *prima facie* case of control person liability under Section 20(a) of the Exchange Act by alleging "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

The parties appear to agree that, for companies like Perion that are listed on both the TASE and a U.S. stock exchange, Israel applies U.S. securities laws to enforce disclosure obligations. *See* Am. Compl. ¶¶ 384–86 (citing cases from Israel); Def. Mem, Dkt. 76, at 11 n.4 (citing *In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 341–44, 357–58 (D. Conn. 2021)).[4]

Defendants argue that Plaintiffs failed to plead any actionable misstatements or omissions and failed to plead particularized facts that give rise to a strong inference of scienter. Def. Mem. at 11–25.

### A. Plaintiffs Adequately Plead Actionable Statements Pertaining to the Quality of Searches

The statements Plaintiffs point to that pertain generally to search traffic or publishers are not actionable. Effectively, Plaintiffs claim that those statements[5] are misleading by omission; that by failing to disclose, for example, that search traffic under the Agreement stemmed from low-quality publishers, Gerstel's February 9, 2021, statement that search advertising revenue

---

[4]     The Court notes that it is far from settled that Israel applies U.S. securities law in such circumstances. *See Teva*, 512 F. Supp. 3d at 357–58. But for the reasons discussed *infra*, because Plaintiffs' federal claims are dismissed and the Court declines to exercise supplemental jurisdiction to reach Plaintiffs' Israel securities law claim, the Court need not delve into how this case would be evaluated under the law of Israel.

[5]     This includes the allegations in the Amended Complaint at paragraphs 120, 192–97, 201–43, 247–252, 256–58, 260–74, 278–286, 288–89, 290–95, 297, 301–04, 309–10.

"increased by 3% due to a higher number of daily searches" misled investors. *See* Am. Compl. ¶¶ 193–94. But "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Synchrony*, 988 F.3d at 167 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). Such a duty may arise when, as relevant here, the statement "would be inaccurate, incomplete, or misleading without further context." *Id.* (citation and internal quotation marks omitted). In demonstrating "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available," *id.* at 170 (citation omitted), Plaintiffs must explain "with particularity how investors were misled because they lacked the details" regarding the quality of Perion's publishers. *Nandkumar v. AstraZeneca PLC*, No. 22-2704-CV, 2023 WL 3477164, at *2 (2d Cir. May 16, 2023) (unpublished).

Plaintiffs have failed to explain with particularity how investors were misled by the omitted information. Plaintiffs' "omission-based theory is strained" because the relationship between the topics Perion discussed — search advertising revenues and volume, identification of publishers, and Perion's display advertising business — and "the allegedly omitted information" — publisher or search quality — "is fairly attenuated." *Plumber & Steamfitters Local 773 Pension Fund, Bos. Ret. Sys. v. Danske Bank A/S*, 11 F.4th 90, 103 n.4 (2d Cir. 2021). The statements regarding search revenue and volume "did not trigger a generalized duty requiring [D]efendants to disclose the entire corpus of their knowledge" related to those topics. *Id.* (citation omitted); *see also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 386 (S.D.N.Y. 2012) ("A corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." (citation and internal quotation marks omitted)).

Absent a more particularized showing, the securities laws did not require Defendants to discuss publisher quality each time they discussed their search advertising business.

Defendants' statements directly addressing the quality of Perion's searches and publishers present a closer question.[6] Defendants argue that those statements are not false or are otherwise inactionable puffery. *See* Def. Mem. at 12–14, 17–20.  "[G]enerally optimistic opinions . . . are too general to cause a reasonable investor to rely upon them and therefore are *precisely* the type of puffery that" the Second Circuit has "consistently held to be inactionable." *Philip Morris*, 89 F.4th at 417 (citation omitted). Several of the statements about which Plaintiffs complain[7] do not state or imply that Perion contracted only with publishers that generated high-quality searches or even that Perion contracted with high-quality publishers but, rather, reflect aspirational views espoused by certain Defendants regarding search quality. *See* Am. Compl. ¶¶ 245, 254 (Jacobson partially attributed Perion's results with Microsoft to a "*focus* on quality") (emphasis added), *id.* ¶ 259 (Gerstel claimed Perion was working with partners "to increase the number of quality searches"), *id.* ¶ 276 (Gerstel offered his view that Microsoft's purchase of ChatGPT would cause it to "rely more on partners like CodeFuel to drive more searches" and "underline quality searches that they're able to monetize"), *id.* ¶ 287 (Gerstel described the "quality process" as "very rigid"), *id.* ¶ 296 (Jacobson explained that the goal of Perion's business was to add more "qualified publishers"). The Court agrees with Defendants that those vague statements constitute nonactionable puffery or opinion.[8]

---

[6] This includes the allegations in the Amended Complaint at paragraphs 8–9, 55–56, 78, 130, 198–200, 244–46, 253–55, 259–60, 275–78, 287, 289, and 296–97.

[7] This includes the allegations in the Amended Complaint at paragraphs 8–9, 55–56, 78, 245, 254, 259, 275-76, 287, and 296.

[8] For many of the same reasons, the statements Plaintiffs point to regarding Perion's relationship with Microsoft are too general to be actionable, and Plaintiffs fail to allege that the relationship was deteriorating behind

Although it is a very close call, Plaintiffs have adequately alleged that two statements made by Gerstel in 2022 were misleading. In press releases issued on February 10 and April 28, 2022 (and attached to Form 6-K's signed by Sigron), Gerstel described Perion's quality standards as "impeccable." *Id.* ¶¶ 244, 253. Plaintiffs allege that a significant percentage of search traffic Perion sent to Microsoft came from low-quality publishers directing fake or non-monetizable traffic. *Id.* ¶¶ 246, 255. While "impeccable" is an odd adjective to use to modify "quality standards,"[9] Plaintiffs have adequately alleged that, in context, a reasonable investor would understand Gerstel's statement to mean that Defendants' quality standards were sufficiently rigorous that they did not allow low-quality publishers to send traffic to Microsoft. *Cf. In re Vale S.A. Sec. Litig.*, No. 19 CV 526 (RJD) (SJB), 2020 WL 2610979, at *9, *9 n.12, *10 (E.D.N.Y. May 20, 2020) (allegations that defendant represented that its dams were "impeccable" when defendant knew dams fell below safety standards pled more than mere mismanagement and were not obviously immaterial).

Defendants' strongest argument is that those statements by Gerstel are puffery. But however vague or subjective the phrase "high-quality" may be in many contexts, *see* Def. Mem. at 13 (collecting cases), Plaintiffs adequately allege that "quality" in this context is a term of art. According to Gerstel, "quality means searches with high intent." Am. Compl. ¶ 78. By way of analogy, a real estate development company that described the properties it was exploring as

---

the scenes sufficient to render Defendants' statements regarding the strength of the relationship actionable. *See* Am. Compl. ¶¶ 21, 77, 298–300, 305–08, 311–21; *see also id.* ¶¶ 5, 61. Likewise, Gerstel's description of Newsweek as a "first tier" publisher is too vague to be actionable, and Plaintiffs fail to allege that Gerstel had any reason to believe the assertion was false at the time it was made. *Id.* ¶¶ 130, 198–99.

[9] "Impeccable" is defined as "free from fault or blame." *Impeccable*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). It does not mean "stringent" nor is it synonymous with "strict," "uncompromising," or "rigorous," which appears to be the meaning on which Plaintiffs are relying, but it could be interpreted to mean "free from imperfections." *See Fault*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).

"prime" opportunities could conceivably claim it engaged in puffery, but a company that represented its loan portfolio to be comprised of "prime" loans could face liability if the loan portfolio was actually comprised of loans made to borrowers with very low credit ratings. *See In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 CIV. 6728 (CM), 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018).

In light of the particular meaning Perion attributed to the term "quality" in relation to searches and publishers, the quality requirements under the Agreement, and the significance of the Agreement to Perion's business, Am. Compl. ¶¶ 58–59, 78, 137; Agreement Sched. 1 at 16–17, §§ 3.1(c), and 3.5, Plaintiffs have adequately alleged that a reasonable investor would understand Gerstel's representations to mean that Perion had rigorous quality standards that resulted in mostly high-quality searches when, according to Plaintiffs, much of the traffic was of a low quality.[10]

### B. Plaintiffs Fail to Adequately Plead Scienter

Although Plaintiffs have adequately pled that two of Defendants' statements made in 2022 could be actionable, they have failed to plead with particularity facts giving rise to a strong inference of scienter. The PSLRA requires the Amended Complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting 15 U.S.C. § 78u–4(b)(2)). A strong inference of scienter is "more than merely

---

[10] Plaintiffs have adequately alleged that much of the traffic Perion generated prior to Gerstel's 2022 statements was low-quality traffic. For purposes of ruling on Defendants' motion to dismiss, the Court must accept those allegations as true. Nevertheless, it is worth noting that Defendants make very credible arguments that Microsoft, the customer for whom Perion was generating searches and the company that had complete visibility into the searches generated by Perion, named Perion its 2021 Global Supply Partner of the Year. Am. Compl. ¶¶ 250, 253. While not dispositive, that could create substantial proof problems for Plaintiffs if this case proceeds.

plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007)). Plaintiffs must allege facts showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (citation omitted).

Plaintiffs point to stock sales made by Sigron and Gerstel well after either of the statements the Court has found could be actionable but during the Class Period. *See* Am. Compl. ¶ 179. In addition to the fact that the timing of those sales does not support the contention that Defendant acted with scienter when they made allegedly false statements in early 2022, Plaintiffs acknowledge that many of those sales were made pursuant to a 10b5-1 trading plan. *Id.* ¶ 180. The sales were not timed suspiciously, and Plaintiffs fail to allege any other facts that would allow the Court to infer that the sales were "unusual," which is "necessary to raise an inference of bad faith or scienter." *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 355–56 (citation omitted). Plaintiffs' further references to the decline in the number of shares held by a group comprised of all of Perion's directors and officers during the Class Period, a group that includes at least six individuals not named in this action, and speculation that Defendants sold even more shares, *see* Am. Compl. ¶¶ 181–84, are the kind of "blanket references" that ignore Rule 9(b)'s particularity requirement. *In re UBS AG Sec. Litig.*, No. 07 CIV. 11225 RJS, 2012 WL 4471265, at *9 (S.D.N.Y. Sept. 28, 2012) (citation omitted), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). Finally, the fact that Defendants received equity-based compensation does not evince a motive to commit fraud, as motives

12

"possessed by virtually all corporate insiders," such as increasing compensation, are insufficient to demonstrate motive. *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

Plaintiffs' attempts to "specifically allege[] [D]efendants' knowledge of facts or access to information contradicting their public statements" likewise fall short. *Id.* at 308. CW 1, who worked on the Sales team at CodeFuel from February 2022[11] to August 2023, reported to Amit Gelber, CodeFuel's Chief Revenue Officer ("CRO") and Head of Sales, who, in turn, reported to Jacobson, then the General Manager of CodeFuel. Am. Compl. ¶¶ 32, 132–33. At the time, Jacobson allegedly reported to Gerstel, who answered to Perion's Board. *Id.* ¶ 133. CW 1 claimed that CodeFuel's practices related to the proliferation of junk search traffic was "common knowledge" at CodeFuel and that Gelber "1000% knew about these practices." *Id.* ¶ 153. At some unspecified time, CW 1 spoke to Gelber about issues with the quality of traffic, and Gelber "did not deny them." *Id.* ¶¶ 151–53. From those vague allegations, Plaintiffs speculate that Jacobson must have known about low-quality traffic. *Id.* ¶ 346. Absent from Plaintiffs' generalized allegations about common knowledge and speculation about what Jacobson "had to have known" are any particularized facts tending to show that Jacobson had any direct knowledge of junk traffic practices. *See Novak*, 216 F.3d at 308, 313–14; *Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) (unpublished). By failing to adequately allege the direct knowledge of Jacobson — the link in the chain connecting Gelber to Gerstel — Plaintiffs have certainly failed to allege that Gerstel possessed any information that contradicted what he said in February

---

[11]  He apparently joined the team at approximately the same time as Gerstel's first potentially actionable statement and just two months before Gerstel made the second potentially actionable statement. *See* Am. Compl. ¶¶ 132, 244, 253.

and April 2022 regarding the quality of the traffic (i.e., those statements the Court found to be actionable).

Plaintiffs' alternative argument that Gelber's knowledge can be attributed to Perion lacks merit. *See* Pl. Mem., Dkt. 78, at 20–21. First, Plaintiffs have not adequately alleged that Gelber acted with scienter. Their conclusory allegations that Gelber "not only knew about" the engagement with low-quality traffic but also "invented the games" and "taught the games" are too vague and conclusory to satisfy the particularity requirement. Am. Compl. ¶ 153. But even if Plaintiffs could adequately allege that Gelber acted with scienter, they do not adequately allege facts that would allow the Court to attribute Gelber's scienter to the Company. Although there is no "bright-line rule" to determine the circumstances under which an executive is senior enough to attribute his scienter to the company, courts generally "consider the individual's relative seniority at the issuing entity and the connection between the executive's role and the fraudulent statements." *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017). As the Complaint does not allege with particularity that Gelber was part of Perion's senior management or "had any role" in crafting Perion's quality standards or "its disclosures of those [standards] to the market," his scienter, even if adequately alleged, cannot be attributed to the Company. *Id.* at *8 (holding that the scienter of an individual who was not alleged to be part of senior management and was one of many partners at a company could not be attributed to his employer).

In short, Plaintiffs have failed adequately to plead that the two potentially actionable false statements were made with scienter.

### C. Plaintiffs Fail to State a Section 20(a) Claim

Because Plaintiffs failed to allege a primary violation of the Exchange Act, they have failed to state a claim under Section 20(a).  *See ATSI Commc'ns*, 493 F.3d at 108.

### D. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiffs' Israel Securities Law Claim

A district court has discretion to exercise supplemental jurisdiction even after it "has dismissed all claims over which it had original jurisdiction."  *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996).  In deciding whether to retain jurisdiction, courts "consider factors such as judicial economy, convenience, fairness, and comity."  *Id.* at 1191.  In declining to exercise supplemental jurisdiction, the remaining claims "may be dismissed without prejudice" to allow for resolution by the appropriate tribunal.  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 613 F. Supp. 2d 437, 442 (S.D.N.Y. 2009) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966)).

Given the early posture of this action, judicial economy and convenience counsel in favor of dismissing Plaintiffs' Israel securities law claim.  Accordingly, the Court declines to exercise supplemental jurisdiction over that claim.

## III. Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure provides that the Court should freely give leave to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[C]omplaints dismissed under the PSLRA 'are almost always dismissed with leave to amend,'" *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 239 (S.D.N.Y. 2023) (quoting *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017)), because "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)."  *ATSI Commc'ns*, 493 F.3d at 108.  Although the Court is skeptical that

Plaintiffs can adequately plead scienter as to the only two statements that are potentially actionable, it will give them another opportunity to try.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. This action is dismissed. Plaintiffs are granted leave to file a Second Amended Complaint by **Friday, July 25, 2025**. Plaintiffs are reminded that the Undersigned's Individual Practices in Civil Cases require them to file a redlined version of the Second Amended Complaint ("SAC") comparing the revisions made to the Amended Complaint, as well as a clean copy of the SAC.

The Clerk of Court is respectfully directed to terminate the open motion at Dkt. 75.

**SO ORDERED.**

Date:  June 27, 2025
      New York, New York

_____
**VALERIE CAPRONI**
**United States District Judge**